[No. A029555. First Dist., Div. Two. June 23, 1987.]

JOHN S. FOGGY et al., Plaintiffs and Appellants, v.
RALPH F. CLARK & ASSOCIATES, INC., et al., Defendants and
Respondents.

1206

COUNSEL

Rose & Kornhauser, Samuel Kornhauser and M. Fred Rose for Plaintiffs and Appellants.

Reuben, Quint & Valkevich and Matthew F. Quint for Defendants and Respondents.

OPINION

BENSON, J.—John and Georgia Foggy (plaintiffs) appeal from an order granting judgment notwithstanding the verdict, an order granting in part

and denying in part a motion for new trial and the judgment entered thereon in favor of defendant Ralph F. Clark & Associates, Inc.

Viewing the record in the light most favorable to plaintiffs, as we must on review from a judgment notwithstanding the verdict (*Borba* v. *Thomas* (1977) 70 Cal.App.3d 144, 152 [138 Cal.Rptr. 565]), the following facts were presented at trial.

In the spring of 1981, Gilbert Marino was looking for a $200,000 loan. He approached Sherwood Wiseman, a real estate broker, about obtaining such a loan and offered the equity in his residence located at 30 Woodgate Court in Hillsborough as collateral. Wiseman went to plaintiff John Foggy to inquire whether Foggy would be interested in making such a loan.

Mr. Foggy, who had extensive real estate investments and had previously loaned money to Marino, said he might be interested in making the loan. However, Foggy required that the $200,000 loan be in second position and that there be sufficient equity in the property to cover both the first and second loans. Consequently, he wanted more information on the Marino residence, and requested an appraisal be made by an M.A.I. appraiser. Mr. Wiseman conveyed Foggy's requirements to Mr. Marino.

Thereafter, Marino retained defendant Ralph F. Clark & Associates to do the appraisal. Ralph F. Clark & Associates is a California corporation engaged in the business of real estate appraisal. Ralph Clark is an M.A.I. appraiser with 20 years of experience. Margarita Aguirre is a secretary-office manager of Ralph F. Clark & Associates. However, at the relevant time, she had made 15 appraisals. She never had appraised a home which was partially under construction.

In June of 1981, Ms. Aguirre went to the Marino residence to do the appraisal. She physically inspected the premises and measured the rooms. Mr. Marino told her that he thought the property was worth around $600,000. Her notes of the inspection indicate there were four finished bedrooms and the house contained 2,363 square feet. Since Mr. Marino told her that an additional bedroom, presently under construction, would be in excess of 800 square feet, she wrote the total square footage of the house as being 3,221.

After completing the inspection of the house, Ms. Aguirre prepared a final typed appraisal, which was reviewed by Ralph Clark. The document describes the subject property as having five bedrooms, three and one-half baths and totalling 3,800 square feet. In addition, three skylights and three fireplaces are listed as special features. No mention is made of construction.

In fact, the property had four bedrooms, one of which had been demolished by construction, and the entire residence totalled 2,800 square feet. The written appraisal values the house at $610,000 and states that Ralph Clark had physically inspected the premises. At trial, Clark admitted that he had not physically inspected the property and knew that he had not inspected it.

Relying on the appraisal from defendants, Foggy loaned Marino $200,000. Thereafter, Marino defaulted on the loan and declared bankruptcy. On June 7, 1982, Foggy foreclosed on his second deed of trust and purchased the property at the trustee's sale which was attended by 10 to 12 people.

There is a serious conflict in the evidence as to how much Mr. Foggy paid for the property at the trustee's sale. Foggy testified that the property sold for $265,000, which represented $255,000 to cover the first loan plus a $10,000 credit bid. On the other hand, a letter from the trustee to plaintiffs stated that the property was sold to them for the sum of $239,094.06. However, the trustee's deed upon sale states that the amount of unpaid debt together with costs was $239,094.06 and the actual amount paid by Foggy at the trustee's sale was $10,000.

Foggy viewed the Marino residence for the first time after the foreclosure sale. The property was in total disrepair; the shrubbery was dying, the swimming pool was dirty, there were holes in the roof due to construction, there was no covering over the construction area, the floors were warped and discolored and the new construction joists were unusable. Foggy immediately contacted Ralph Clark to discuss the appraisal of the property. Foggy was concerned because the number of bedrooms was wrong, the number of baths was wrong, the number of skylights was wrong, the number of fireplaces was wrong, there was no mention of the construction and the total square footage of the house was erroneous. Although there was some discussion that Clark would contribute to the rehabilitation of the property, the parties never reached an agreement on the matter.

Following the foreclosure sale Foggy attempted to improve the property so that it could be sold. He paid for landscaping and pool maintenance. He paid in excess of $50,000 for payments on the first loan. In addition, he paid more than $10,000 in property taxes.

On December 3, 1982, plaintiffs filed a complaint against defendants Ralph F. Clark & Associates, Inc., Ralph F. Clark and Margarita Aguirre. The complaint set forth causes of action in fraud, conspiracy, breach of fiduciary duty, negligence and breach of oral contract. In October of 1983, the house was totally destroyed by fire. An *in limine* motion by the plaintiff

to preclude any evidence of the receipt of fire insurance proceeds was granted by the trial court relying on the collateral source rule.

During trial plaintiffs' witness, Sally Peter, a real estate salesperson, testified as to the value of the Marino residence at the time of the Clark appraisal. The court ruled that she could testify "as to value in June '81 and June '82" but did not find that she was an appraiser. The record is unclear as to the year for which Peter's evaluation was given. However, she stated that the value of the property was between $300,000 and $350,000. She based her evaluation of the property on a single comparable house, located at 555 Chateau Road, which was in a different neighborhood. Peter valued the Marino lot alone at $250,000.

In contrast, defendants' expert, Dale Farnow, a real estate broker and appraiser, opined that the value of the subject property at the time of the appraisal was $550,000. In addition, Farnow agreed that the land alone was worth $250,000.

Evidence was introduced that after the 1983 fire, Mr. Foggy had submitted to the San Mateo County Assessor's office a signed statement, under penalty of perjury, that the total value of the property before the fire was $550,000. The document estimates that Foggy incurred a loss of $300,000 for the house and $100,000 due to damage on the land.

At the conclusion of trial and before the case was submitted to the jury, defendants moved for a nonsuit as to each of plaintiffs' causes of action, except that for negligence. The court granted nonsuit on the causes of action for breach of fiduciary duty, breach of contract, and conspiracy. Thereafter, the jury returned a general verdict of $200,000 in favor of plaintiffs and against Ralph F. Clark & Associates, Inc., only.

On October 111 1984, defendants timely noticed a motion for judgment notwithstanding the verdict and a motion for new trial. In response, on October 26, 1984, plaintiffs filed a notice of appeal and opposition to defendants' motions.

On November 5, 1984, the court filed the order and judgment from which plaintiffs appeal. The judgment recites that the court had concluded that there was no substantial evidence of damages to support the verdict: "The only evidence of fair market value of the 30 Woodgate property on the date of foreclosure that tended to show Plaintiffs suffered any damage was the opinion testimony of Sally Peter. Sally Peter is not an appraiser, but a real estate saleswoman. She testified that although she was actively involved in the sale of residential real estate on the Peninsula, she had participated in

sales of only five or six houses in Hillsborough. Plaintiffs' counsel identified three appraisers who they intended to call to testify. Only one of those, Wayne Stiefvater, testified during Plaintiffs' principal case, and did not testify as to value. The second, James Tilley, never testified. The third, Francis Bland, testified he had not been asked to offer his opinion as to value until one day before he took the stand as part of Plaintiffs' rebuttal.[1] [¶] Plaintiffs instead relied only upon the opinion of Ms. Peter. She testified that the fair market value of the subject land alone was $250,000.00, yet she gave her opinion that the value of the land and the 3500 square foot residence was $300,000.00 to $350,000.00. Her testimony that the value of the residence itself was less then $15.00 to $30.00 per square foot is inherently incredible. Plaintiff himself, in his Owner's Estimate of Loss, valued the residence alone at $300,000.00 or approximately $100.00 per square foot. [¶] Ms. Peter further stated that an opinion regarding the fair market value of residential real estate must be based on knowledge regarding the sale of comparable properties. However, she identified only one comparable sale at 555 Chateau, Hillsborough, California, describing it as an older, run down house. According to Plaintiffs' counsel, she did not even state the correct address of her only comparable. She was unable to provide any other comparables. This testimony is inherently incredible and is not substantial evidence to support the verdict." Thereafter, the trial court granted defendant's motion for judgment nothwithstanding the verdict, vacated the judgment based on the jury verdict, entered judgment in favor of all three defendants and granted defendant Ralph F. Clark & Associates' motion for new trial on the grounds of excessive damages and insufficiency of the evidence to justify the verdict.

On appeal plaintiffs first contend that the judgment notwithstanding the verdict must be reversed since the trial court lacked jurisdiction to enter the judgment notwithstanding the verdict and the evidence before the jury supported the jury verdict. We address the jurisdictional issue first.

■ Citing *Copley* v. *Copley* (1981) 126 Cal.App.3d 248, 299 [178 Cal.Rptr. 842], *Takahashi* v. *Fish and Game Com.* (1947) 30 Cal.2d 719, 725 [185 P.2d 805], and more specifically *Weisenburg* v. *Molina* (1976) 58 Cal.App.3d 478, 486 [129 Cal.Rptr. 813], plaintiffs contend that because they filed a notice of appeal on October 26, 1981, prior to the time that judgment notwithstanding the verdict was entered, the trial court was divested of its jurisdiction to grant the judgment nothwithstanding the verdict. We disagree both with plaintiffs' contention and the holding in *Weisenburg*.

---

[1] The trial court refused to allow Mr. Bland to testify as a rebuttal witness on value of the property.

As a general rule, a duly perfected appeal divests the trial court of further jurisdiction in the cause except with respect to collateral matters. (*Neff* v. *Ernst* (1957) 48 Cal.2d 628, 633-634 [311 P.2d 849].) However, it is settled that a motion for new trial constitutes a collateral matter. (*Ibid.*; *Weisenburg* v. *Molina, supra,* 58 Cal.App.3d at pp. 485-486.) The question is why the rule should be different for a motion for judgment notwithstanding the verdict.

In *Estate of Waters* (1919) 181 Cal. 584 [185 P. 951], our Supreme Court discussed the reason that a motion for new trial was a collateral matter to the underlying judgment. As the *Waters* court explained, at common law a motion for new trial was made before the rendition of the judgment. In 1907, the Code of Civil Procedure[2] was amended to provide for motions for new trial to be made after receiving notice of the entry of the judgment. (Stats. 1907, ch. 380, § 2.) The provisions of the code as they stood prior to 1915 were viewed by the Supreme Court as an "intent on the part of the legislature to make the motion for a new trial wholly independent of and collateral to the main proceeding, in effect a *new action* in the nature of a writ of error brought to reverse the judgment in the lower court. [Citations.]" (*Id.* at p. 586, italics in original.) Thereafter, the code was again amended, in 1915, to provide that a motion for new trial was to be made within 10 days after the entry of the judgment. In addition, former sections 939 and 956 were amended to extend the time within which to appeal to 30 days beyond the time of the entry of the order determining a motion for a new trial. The issue presented in *Waters* was whether the 1915 amendment evidenced an intent on the part of the Legislature to reintegrate the proceeding on motion for a new trial with the principal proceeding in the case. The high court ruled in the negative, holding that "[w]here ... a separate appeal from an order on a motion for a new trial is authorized, the perfection of an appeal from the judgment or order in the main proceeding does not divest the court of jurisdiction to hear and determine the motion." (*Id.* at p. 587.)

*Waters* declined to discuss the possibility that appeals from orders on motions for new trial might merge with appeals from the principal proceedings. Nevertheless, the opinion survives to this date and is used for authority that a motion for new trial is a collateral action. (See, e.g, *Neff* v. *Ernst, supra,* 48 Cal.2d at p. 634; *Weisenburg* v. *Molina, supra,* 58 Cal.App.3d at pp. 485-486.) Consequently, we are bound by that decision. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 936].)

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

Section 629, governing motions for judgment notwithstanding the verdict, was first enacted in 1923. (Stats. 1923, ch. 366, § 1.) In its current version it is integrally related to section 659, which deals with motions for new trial.[3] It is clear from reading section 629 that motions for judgment notwithstanding the verdict were meant to be made within the same time frame allotted to the motion for new trial, and the two motions were to be considered and decided together. It is equally obvious that the Legislature did not intend that motions for new trial were to be collateral to the underlying judgment while motions for judgment notwithstanding the judgment were not.

In *Weisenburg,* the court acknowledged the established rule that a motion for new trial is a matter collateral to the judgment and therefore the trial court retains jurisdiction to hear and determine the motion after an appeal has been taken from the judgment. However, the court then held that the same rule does not apply to a motion for judgment notwithstanding the verdict: "We have been cited to no authority by appellants, ... to dispute the trial court's determination that the filing of the notice of appeal divested it of jurisdiction to hear the remaining motions for judgment notwithstanding the verdict and to vacate the judgment and enter a different judgment.

---

[3] Section 629 states as follows: "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made. [¶] A motion for judgment notwithstanding the verdict shall be made within the period specified by Section 659 of this code in respect of the filing and serving of notice of intention to move for a new trial. The making of a motion for judgment notwithstanding the verdict shall not extend the time within which a party may file and serve notice of intention to move for a new trial. The court shall not rule upon the motion for judgment notwithstanding the verdict until the expiration of the time within which a motion for a new trial must be served and filed, and if a motion for a new trial has been filed with the court by the aggrieved party, the court shall rule upon both motions at the same time. The power of the court to rule on a motion for judgment notwithstanding the verdict shall not extend beyond the last date upon which it has the power to rule on a motion for a new trial. If a motion for judgment notwithstanding the verdict is not determined before such date, the effect shall be a denial of such motion without further order of the court. [¶] If the motion for judgment notwithstanding the verdict be denied and if a new trial be denied, the appellate court shall, when it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict. [¶] Where a new trial is granted to the party moving for judgment notwithstanding the verdict, and the motion for judgment notwithstanding the verdict is denied, the order denying the motion for judgment notwithstanding the verdict shall nevertheless be reviewable on appeal from said order by the aggrieved party. If the court grants the motion for judgment notwithstanding the verdict or of its own motion directs the entry of judgment notwithstanding the verdict and likewise grants the motion for a new trial, the order granting the new trial shall be effective only if, on appeal, the judgment notwithstanding the verdict is reversed, and the order granting a new trial is not appealed from or, if appealed from, is affirmed."

Clearly these latter motions directly concerned 'matters embraced' in or 'affected' by the judgment appealed from, within the meaning of section 916;[4] and the trial court properly ruled it was without jurisdiction to hear these motions." (*Weisenburg* v. *Molina, supra,* 58 Cal.App.3d at p. 486.)

We are at a loss to understand how a motion for judgment notwithstanding the verdict can be considered as concerned with "matters embraced" in or "affected" by the judgment appealed from, while a motion for new trial is not. It is for this reason that we hold a motion for judgment notwithstanding the verdict is, just as a motion for new trial, a matter collateral to the judgment. This ruling, just as the Legislature intended, enables the trial court to consider both a motion for judgment notwithstanding the verdict and a motion for new trial at the same time and avoids what would otherwise be the absurd result of depriving a party of a postjudgment remedy authorized by the Legislature.

We next address whether the motion for judgment notwithstanding the verdict was properly granted in this case. ■ It is well established that "[a] motion for judgment nothwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." (*Brandenburg* v. *Pac. Gas & Elec. Co.* (1946) 28 Cal.2d 282, 284 [169 P.2d 909]; see also, *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr.681, 534 P.2d 377, 74 A.L.R.3d 1282] *Arthur* v. *Avon Inflatables Ltd.* (1984) 156 Cal.App.3d 401, 406 [203 Cal.Rptr. 1].) We view the lower court's ruling with this standard in mind.

■ However, prior to reviewing the evidence, it is necessary to set forth the proper measure of damages that should be applied in this case. At trial plaintiffs requested that the jury be instructed on the "out-of-pocket" rule for damages (BAJI No. 12.56) and on punitive damages. (BAJI No. 14.71) Defendants argued that damages should be limited to those on foreclosure on a security instrument, i.e., the amount of the loan less fair market value of the property received. Thereafter, the court instructed the jury on the measure of damages for impairment of security[5] and omitted the instruction on punitive damages. We find this to be error.

---

[4] Section 916, subdivision (a) states: "Except as provided in Section 917.1 through 917.9 and Section 117.7, the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."

[5] This instruction stated: "If, under the Court's instruction, you find that Plaintiffs are entitled to a verdict against Defendants, or any of them, you must then award Plaintiffs damages,

In making its rulings on these jury damage instructions the court apparently relied on *Stephans* v. *Herman* (1964) 225 Cal.App.2d 671 [37 Cal.Rptr. 746] and *Howe* v. *City Title Ins. Co.* (1967) 255 Cal. App.2d 85 [63 Cal.Rptr. 119], two cases cited by defendants. However, both of these cases involved title insurance companies whose negligence caused the plaintiffs to lose their security for loans already made. Similarly, *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590 [125 Cal.Rptr. 557, 542 P.2d 981], which is cited by both parties, is inapposite, since that case also involves the impairment of security. In contrast, the instant action is one in tort where plaintiffs allege that defendants' negligence or fraud caused them to enter into a loan agreement.

In *Gagne* v. *Bertram* (1954) 43 Cal.2d 481 [275 P.2d 15], plaintiff, relying on defendant's negligent soil analysis and resulting misrepresentation concerning the quality of the land, was induced into purchasing real property. The Supreme Court found that the proper measure of damages to be the actual losses suffered because of the misrepresentation. (*Id.* at p. 490.) While the present case does not involve the purchase of land, we find plaintiffs' detrimental reliance on defendants' appraisal to be similar in principal to that of the plaintiff in *Gagne*. Consequently, the measure of plaintiffs' damages is governed by Civil Code, sections 3333 and 1709.[6] It follows that if these code sections govern the measure of damages in the instant action, the jury also should have been allowed to decide whether punitive damages were warranted. Having determined the proper measure of damages, we turn to the trial court's ruling on defendant's motion for judgment notwithstanding the verdict.

■ We are in full agreement with the court's determination that Sally Peter's testimony cannot constitute substantial evidence of damages. As the judgment herein correctly states, "The sum total of the above definitions [of substantial evidence] is that, if the word 'substantial' means anything at all,

---

if any, proximately caused by the negligent or intentional providing of erroneous information upon which you base your finding of liability. [¶] The amount of such award shall be measured by the amount by which the entire amount of the indebtedness due at the time of sale exceeded the fair market value of the property or interest sold at the time of sale with interest thereon from the date of sale. [¶] However, in no event shall the amount of said judgment, exclusive of interest after the date of sale, be more than the difference between the amount for which the property was sold and the entire amount of the indebtedness secured by the deed of trust or mortgage."

[6]Civil Code section 3333 states as follows: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Civil Code section 1709 states as follows: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

it clearly implies that such evidence must be of ponderable legal significance. Obviously, the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; ..." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]; see also, *Claussen* v. *First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 436 [230 Cal.Rptr. 749].) Thus, the court may disregard evidence in support of the verdict if that evidence is "inherently incredible." (*Hale* v. *Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 690 [117 Cal.Rptr. 146], overruled on other grounds in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141].)

Sally Peter's testimony was the only evidence of the subject property's fair market value on the date of foreclosure that was presented on plaintiff's behalf at trial. Ms. Peter had never previously been qualified as an expert; prior to testifying she had not been asked by plaintiffs' counsel to render an opinion as to the value of the property for any particular date; and she was unable to give a single example of a comparable sale where a house in the neighborhood had sold at a price equivalent to the one she placed on the subject property.

More importantly, although Peter did not know the square footage of the Marino residence, she acknowledged that one way of calculating values of real property is to determine the sales price per square foot of the building. When informed that the comparables used in defendants' appraisal had been valued at $153 to $162 per square foot, the witness stated that the subject property would have sold at less than $90 per square foot. However, Peter did not know whether the comparable she had used at 555 Chateau had sold for less than $90 per square foot and was unable to identify any other property in the Hillsborough area that had sold at such a price. Finally, Peter opined that the land alone on the subject property was worth $250,000. If the square footage of the Marino residence was only 2,800 square feet, this would put the value of the property at less than $36 per square foot. It cannot be said as a matter of law that this evidence was "reasonable in nature, credible, and of solid value." The trial court was patently justified in characterizing this evidence as "inherently incredible and not substantial evidence."

Plaintiffs argue that the best evidence of the fair market value of the subject property is the price paid at the trustee's sale. They support this argument with a quote from *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 607, which states, " '[T]he purpose of the trustee's sale is to resolve the question of value and the question of potential forfeiture through competitive bidding. . . .' [Citation.] In *Smith* v. *Allen* (1968) 68 Cal.2d 93, 95-96 . . ., this court held that a nonjudicial foreclosure sale, if regularly held, finally

fixes the value of the property therein sold." *Cornelison* significantly differs from the case before us and we disagree that the cited rule has application here.

In *Cornelison,* the plaintiff sold her property to the Chanons, taking back a promissory note secured by a first deed of trust. Thereafter, the Chanons conveyed the property to defendant by grant deed. Five years later the county health department condemned the house as unfit for human habitation. When the Chanons defaulted on the promissory note, plaintiff purchased the property at a trustee's sale for the sum representing the balance due on the note plus foreclosure costs. She then filed a two-count complaint against defendant alleging breach of contract and waste.

The Supreme Court held that because defendant had not assumed the indebtedness secured by the Chanon deed of trust and no such assumption was contained in the deed by which the Chanons conveyed the property to him, he was not liable for breach of contract. (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 597.) As for the second cause of action, the court held that recovery for waste against the mortgagor following a nonjudicial foreclosure sale is barred by section 580d's proscription against deficiency judgments when the waste results from the depressed condition of the general real estate market but not when the waste is caused by the "bad faith" conduct of the mortgagor. (*Id.* at p. 605.) The court went on to say that the measure of damages in a "bad faith" waste situation is the amount by which the value of the security is less than the outstanding indebtedness and is thereby rendered inadequate. (15 Cal.3d at p. 606.) However, the court found that since plaintiff had entered a full credit bid at the trustee's sale, she had consequently "establishe[d] the value of the security as being equal to the outstanding indebtedness and ipso facto the nonexistence of any impairment of the security." (*Ibid.*)

The circumstances are entirely different in the case at bench. First, as previously stated, this is not an impaired security case. Second, it is not entirely clear how much Mr. Foggy paid for the property at the trustee's sale. Third, the plaintiff in *Cornelison* held the first loan on the property whereas the plaintiffs herein were in second position; consequently, the price paid at the foreclosure sale does not establish the actual value of the property. Fourth, Mr. Foggy did not make a full credit bid. Finally, it is acknowledged that the selling beneficiary at a trustee's sale will often under-bid in order to obtain such benefits as rents which are being held by a receiver. (See Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 1979) § 6.23, pp. 278, 279.) Accordingly, it cannot be said that whatever price Foggy paid at the foreclosure sale constituted the fair market value of the property.

■ Had the measure of damages in this case been based upon impaired security, it would have been proper for the trial court to enter judgment notwithstanding the verdict in favor of defendant. However, as previously discussed, plaintiffs are entitled to all consequential damages resulting from defendants' appraisal of the Marino property. They presented evidence regarding expenses they incurred by keeping the first loan current, paying property taxes and maintaining and insuring the property. Since there was substantial evidence of damages, it was improper to grant the judgment notwithstanding the verdict.

This leads us to the issue of whether the motion for new trial was properly granted. The trial court granted defendant Ralph F. Clark & Associates motion for new trial "on the grounds of excessive damages and insufficiency of the evidence to justify the verdict." In view of the fact that the wrong measure of damages was used and evidence of consequential damages was not considered, the order granting defendant's motion on these grounds was erroneous.

However, the fact that the court granted the motion for a new trial upon one ground does not preclude an examination of other grounds set forth in the motion for new trial. (*Hawkinson* v. *Oesdean* (1943) 61 Cal.App.2d 712, 717 [143 P.2d 967].) Defendant also based its motion on error of law. ■ Prior to trial plaintiffs successfully moved to preclude any reference during trial to the fact that plaintiffs may have received insurance proceeds due to the fire that occurred in October of 1983. Plaintiffs maintained, and the trial court apparently agreed, that such evidence was barred by the collateral source rule. This was error.

Assuming, without deciding, that the collateral source rule has valid application to indemnity payments received from insurance covering fire loss or damage to real property, it is quite clear that the rule cannot be applied under the circumstances of this case. The rule provides that "if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Hrnjak* v. *Graymar, Inc.* (1971) 4 Cal.3d 725, 729 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L..R.3d 224].)

The collateral source rule was intended to apply and has been applied to those situations where the multiple payments are in compensation for the *same injury*. Such is not the case in this action. Here we have two separate and distinct injuries: the 1981 misrepresentation upon which the plaintiff's action is based and the 1983 fire loss. The payment made by the fire carrier is not a payment which plaintiff would otherwise collect from the (misrepre-

senting) tortfeasor. An example of valid application of the rule is found in a case where the personally injured plaintiff receives collateral benefits in the nature of medical and disability payments from a private carrier to recompense for those personal injuries caused by and recoverable from a negligent defendant. The sharp contrast in the present case finds the plaintiff receiving insurance proceeds for a fire loss for which the defendant, under no circumstances, could be held responsible.

The judgment nothwithstanding the verdict is reversed. The order granting new trial is affirmed. Plaintiffs are awarded their costs on appeal.

Rouse, Acting P. J., and Smith, J., concurred.

A petition for a rehearing was denied July 23, 1987, and appellants' petition for review by the Supreme Court was denied September 17, 1987. Mosk, J., was of the opinion that the petition should be granted.