[No B118052. Second Dist., Div. Four. June 7, 1999.]

G. KARLIN MICHELSON et al., Plaintiffs and Appellants, v.
BERT S. CAMP, Defendant and Respondent.

958

COUNSEL

Law Offices of Ian Herzog and Evan D. Marshall for Plaintiffs and Appellants.

Hagenbaugh & Murphy and Neil Gunny for Defendant and Respondent.

## OPINION

**CURRY, J.**—In this case, we are called on to decide the impact of the amount of a lender's bid at a private foreclosure sale on its ability to obtain tort damages in the aftermath of the Supreme Court's decision in *Alliance Mortgage Co.* v. *Rothwell* (1995) 10 Cal.4th 1226 [44 Cal.Rptr.2d 352, 900 P.2d 601] (hereafter *Alliance*), which limited the full credit bid rule. Appellants G. Karlin Michelson, M.D., and Michael Schiffman, M.D., brought suit against respondent Bert S. Camp, doing business as California Certified Appraisers, when property he appraised at $900,000, on which they made a loan secured by a first deed of trust, proved to be worth far less. The trial court granted nonsuit, concluding that because the amount of the credit bid by appellants at the foreclosure sale was greater than their total loan related damages, there was no basis for recovery. Appellants argue that because they resold the property for less than their credit bid, the foreclosure price should be disregarded and they should be permitted to recover either benefit of the bargain damages or the difference between their credit bid and the price obtained when the property was resold. We affirm the trial court's ruling.

### FACTUAL AND PROCEDURAL BACKGROUND

#### *The Loan and Foreclosure*

In 1991, respondent, a professional appraiser, appraised a building owned by Jack Edelman located on La Cienega Boulevard in West Los Angeles, giving it a value of $900,000.[1] In 1992, appellants lent Edelman $475,000 secured by a first deed of trust on the property and a neighboring vacant lot which had been appraised at approximately $100,000. Shortly after accepting the loan, Edelman ceased making payments and filed for bankruptcy protection.

In December of 1993, appellants sought and obtained leave of the bankruptcy court for relief from stay to allow them to foreclose on the property. In the motion for relief from stay, appellants argued, through their counsel, that the property was worth far less than their lien. According to an attached appraisal undertaken by a new appraiser in November of 1993 on appellants' behalf, the La Cienega property had a value of $375,000 and the adjacent vacant lot a value of $35,000. As legal support for the motion, the moving papers relied on section 362(d) of the Bankruptcy Code which requires the court to grant relief from stay with respect to a property if "the debtor does not have an equity in such property." (11 U.S.C. § 362(d).) Dr. Schiffman

---

[1] Although the record does not specify whether Edelman or the loan broker hired respondent to perform the appraisal, he was not hired by appellants.

submitted a declaration in support of the motion in which he attested to the unkempt nature of the property and its lack of insurance, but did not discuss the appraisal or the property's value. At the trustee's sale conducted in May of 1994, appellants purchased the property by submitting a bid of $652,029. Appellants later sold the property for $400,000, taking back a $300,000 deed of trust.

*Proceedings Below*

In September of 1994, appellants filed a complaint against respondent and others[2] alleging causes of action for intentional fraud, negligent misrepresentation, and negligence.[3] According to the complaint, respondent represented to appellants, through an appraisal performed in July of 1991 and recertified in January of 1992, that the Edelman property was worth $900,000, knowing the representation to be false, and thereby induced appellants to enter into the loan agreement with Edelman. The complaint alleged that the recertification "was done specifically for [the Edelman] loan transaction," and that the property was worth only $400,000.

Prior to trial, respondent submitted a trial brief in which he contended that appellants' bid of $652,029 at the foreclosure sale established the market value of the property. Since appellants' damages totaled less than that amount—according to respondent's calculations—there were no recoverable damages. The trial court instructed appellants to present an offer of proof as to the existence of damages.

In their written offer of proof, appellants set forth the following facts which they contended supported their claim of reliance on the misrepresentation: (1) Edelman had filed bankruptcy to protect what he believed to be a valuable property with substantial equity; (2) after Edelman filed for bankruptcy, Yossi Eichenbaum of Advanced Funding assured Dr. Schiffman that there was an "equity buffer" and that there had been a recent offer to purchase the property for $1 million; (3) appellants' original bankruptcy attorney was recommended by Eichenbaum; (4) when the original attorney was unable to obtain a negotiated relief from stay within a reasonable period, appellants hired a different firm, Levine & Eisenberg, which obtained relief from stay in December of 1993.

Concerning the November 1993 appraisal used by Levine & Eisenberg in support of the motion for relief from stay, appellants stated: "In bidding in

---

[2]Other defendants included Advanced Funding Corporation, Inc., which had brokered the loan, and its sole shareholder, officer and director, Yossi Eichenbaum.

[3]Additional claims of negligent and intentional infliction of emotional distress, based on respondent's alleged participation in a scheme to defraud through causing appellants to make a loan on overvalued property, are not a subject of this appeal.

for a sum less than the full indebtedness [at the foreclosure sale], [appellants] relied upon the initial Camp appraisal and the Camp reappraisal. There was another appraisal in the amount of $375,000 which was obtained by Levine & Eisenberg . . . for purposes of the relief from stay action. [Appellants] did not rely upon that appraisal because they did not see it or know of it and did not know that the property was worth far less than the Camp appraisal or the amount of their bid. [Appellants] did not see or learn of the appraisal obtained by bankruptcy counsel until the present action was begun, as testified to at deposition by Dr. Schiffman. . . . [¶] [Appellants] would not logically have bid $600,000 plus on a property known or suspected by them to be worth less than $400,000. The bid was based on two factors: (1) representations in the Camp appraisal and Camp reappraisal, and Eichenbaum's advise [*sic*] that the properties were worth $1 million or more; (2) the fact that [appellants'] actual out of pocket losses and expenditures exceeded $600,000, taking into account principal, interest, costs, attorney's fees, taxes, etc. It is close to but not quite the amount that [appellants] needed to recover from the property to make themselves whole."

In another section of the brief, appellants stated that they had incurred $200,000 in out-of-pocket losses, which they defined to include taxes, insurance, and attorney's and foreclosure fees. Appellants further contended they were entitled not just to out-of-pocket losses, but to loss of the "benefit of the bargain" measured by the difference between the fair market value of the property and $900,000.

*The Judgment of Nonsuit*

The trial court entered a judgment of nonsuit, taking appellants' offer of proof as "tantamount to their opening statement with regard to the facts and evidence they intend to offer on the issue of out of pocket loss attributable to their reliance upon the [respondent] appraisals." The court concluded that "[a]s a matter of law, [appellants] did neither reasonably nor justifiably rely upon [respondent's] appraised values when selecting the amount of their credit bid in July, 1994"; "as a matter of law, $652,029.81 represents the 'value of what [appellants] received' due to their alleged reliance upon the [respondent] appraisals"; "[appellants] neither claim nor intend to prove that their total monetary expenditures or losses (up through the date of foreclosure) exceeded $652,029.81"; "based upon the measure of damages set forth in Civil Code § 3343, . . . there is no triable issue of fact remaining"; and "as a matter of law, [appellants] can show no recoverable damages as to the [respondent]." This appeal followed.

## Discussion

### I

### The Negligence Claim

 Preliminarily, we discuss which of appellants' claims against respondent survive the Supreme Court's decision in *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835]. There the court held that an accounting firm, hired by a company to perform an audit of its financial statement, was not liable to anyone except the party contracting for its services for negligence in performing the audit. (3 Cal.4th at p. 406.) The court further held that persons who are "specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report" may recover on a theory of negligent misrepresentation. (*Id.* at pp. 407-415.) Liability could likewise be imposed for intentional fraud as long as the representations were made with the intent to defraud plaintiff or the public or any other particular class of persons to which plaintiff belongs. (*Id.* at p. 415.)

Appellants alleged in their complaint that although respondent was not in their employ, the 1992 recertification was prepared for their benefit in connection with the Edelman loan transaction. Thus, their misrepresentation claims survive, but there is no basis for the pure negligence claim. (*Bily* v. *Arthur Young & Co., supra,* 3 Cal.4th 370; *Soderberg* v. *McKinney* (1996) 44 Cal.App.4th 1760, 1765-1772 [52 Cal.Rptr.2d 635].)

### II

### The Full Credit Bid Rule

 Appellants contend that the trial court erred in ruling that their damages were barred by the full credit bid rule which they believe has no application to an action by a lender for fraud against the property's appraiser after the Supreme Court's decision in *Alliance*. To understand the proper application of the full credit bid rule, and why appellants are incorrect, some background is necessary.

 First, we distinguish the full credit bid rule from the antideficiency rule. Under the antideficiency rule, "[n]o judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property . . . in any case in which the real property . . . has been sold by the mortgagee or trustee under power of sale contained in the mortgage or

deed of trust." (Code Civ. Proc., § 580d; see also *id.*, § 580b.) This provision means that a lender that chooses to sell property securing a debt through private nonjudicial foreclosure cannot pursue the borrower for any deficiency resulting from the difference between the net proceeds received from the foreclosure sale and the total amount of the debt. It prohibits actions against the borrower on the note, and has not been applied to actions for tort. (See, e.g., *Cornelison* v. *Kornbluth* (1975) 15 Cal.3d 590, 603-604 [125 Cal.Rptr. 557, 542 P.2d 981] [action for waste]; *Evans* v. *California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540, 552-556 [33 Cal.Rptr.2d 646] [action for waste, fraud, and conversion]; *Sumitomo Bank* v. *Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211, 217-218 [229 Cal.Rptr. 719] [alleged misrepresentations regarding inspections and lack of defects to induce continued disbursements of construction loan]; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 139 [135 Cal.Rptr. 802] [claims of promissory fraud].)

■ Notwithstanding the nonapplicability of the antideficiency rule to tort claims, lenders that obtain liened property through nonjudicial foreclosures are generally unable to pursue such claims against either borrowers or third parties. This is because, under the full credit bid rule, the market value of the property is said to be the price obtained at the foreclosure sale. Lenders often make a "full credit" bid on the property, that is a bid equal to the total indebtedness, including interest, late charges, and costs of foreclosure. The lender, having obtained property with a market value equal to the value of the debt and the expenses of collection, could not thereafter complain of being damaged. Thus, in *Cornelison* v. *Kornbluth, supra,* 15 Cal.3d 590 the lender, after purchasing the subject property for an amount equal to the balance due on the note plus foreclosure costs, was precluded from pursuing a third party on a claim of waste. There the Supreme Court held: "[E]ven assuming that defendant is liable on [the basis of having committed bad faith waste], nevertheless plaintiff cannot recover since she purchased the subject property at the trustee's sale by making a full credit bid. . . . [T]he purchase by plaintiff-vendor-beneficiary of the property covered by the purchase money deed of trust pursuant to a full credit bid made and accepted at the nonjudicial foreclosure sale resulted in a total satisfaction of the secured obligation." (15 Cal.3d at p. 606, fn. omitted.)

The court in *Cornelison* explained why this must be the case: " '[T]he purpose of the trustee's sale is to resolve the question of value and the question of potential forfeiture through competitive bidding . . . .' (Hetland, Cal. Real Estate Secured Transactions (Cont. Ed. Bar 1970) p. 255.) In *Smith* v. *Allen* (1968) 68 Cal.2d 93, 95-96 . . . , this court held that a nonjudicial foreclosure sale, if regularly held, finally fixes the value of the

property therein sold. [¶] At the nonjudicial foreclosure sale, the beneficiary is *entitled* to make a credit bid up to the amount of his indebtedness . . . . However, the mortgagee is not *required* to open the bidding with a full credit bid, but may bid whatever amount he thinks the property worth. . . . [¶] . . . If the beneficiary or mortgagee at the foreclosure sale enters a bid for the full amount of the obligation owing to him together with the costs and fees due in connection with the sale, he cannot recover damages for waste, since he cannot establish any impairment of security, the lien of the deed of trust or mortgage having been theretofore extinguished by his full credit bid and all his security interest in the property thereby nullified." (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 607, italics added.)

The court went on to describe how the lender could avoid the impact of the full credit bid rule: "The beneficiary or mortgagee need only enter a credit bid in an amount equal to what he assesses the fair market value of the property to be in its condition at the time of the foreclosure sale. If that amount is below the full amount of the outstanding indebtedness and he is successful in acquiring the property at the foreclosure sale, he may then recover any provable damages for waste." (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 608.) The court described how damages would be calculated where the lender "bids less than the full amount of the obligation and thereby acquires the property valued at less than the full amount"—"[H]e may recover damages for waste in an amount not exceeding the difference between the amount of his bid and the full amount of the outstanding indebtedness immediately prior to the foreclosure sale." (15 Cal.3d at p. 607.)

The Supreme Court's holding in *Cornelison* recognized the need to maintain a balance between the policy of protecting the lender from tortious injury and the policy of ensuring that private foreclosure sales are conducted in a fair manner. If there were no repercussions for making a full credit bid, lenders could manipulate the sale and discourage prospective purchasers who might have been willing to pay just under the value of the lien. In the aftermath of *Cornelison*, lenders that made full credit bids on liened properties at nonjudicial foreclosure sales were precluded from pursuing either the borrower or third parties on tort claims. (See, e.g., *Sumitomo Bank* v. *Taurus Developers, Inc., supra,* 185 Cal.App.3d at pp. 218-219 ["Since the Bank made a full credit bid at the private foreclosure sale, as a matter of law its security was not impaired. . . . [T]he purchase by plaintiff-vendor-beneficiary of the property covered by the purchase money deed of trust pursuant to a full credit bid made and accepted at the nonjudicial foreclosure sale resulted in a total satisfaction of the secured obligation."]; *Brown* v. *Critchfield* (1980) 100 Cal.App.3d 858, 868 [161 Cal.Rptr. 342] ["A mortgagee may maintain an action for waste against either his mortgagor or a third

party tortfeasor. A mortgagee may share in an insurance award, a condemnation award, and a damage award obtained by the mortgagor. In all of the above cases the mortgagee's recovery is limited by the extent of the impairment of his security. The extent of impairment of security may be established by reference to various factors but, in any event, a full credit bid by the mortgagee conclusively establishes that there has been no impairment of security and thus precludes any recovery."].)

III

THE ALLIANCE EXCEPTION

Treating the full credit bid rule as a "bright line rule" ultimately led to an undesirable result. Lenders that relied on supposedly valid appraisals in initiating loans and purchasing properties at foreclosure were left without recourse—even in cases involving massive fraud—and the defrauding parties escaped free and clear, at least as far as civil damages were concerned. *GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co.* (1994) 21 Cal.App.4th 1802 [27 Cal.Rptr.2d 47] and *Western Fed. Savings & Loan Assn.* v. *Sawyer* (1992) 10 Cal.App.4th 1615 [13 Cal.Rptr.2d 639] were two similar cases involving claims of conspiracies to induce the lenders to make loans by allegedly engaging in fraud in connection with loan applications and appraisal reports. In both cases, the plaintiff/lender had obtained the liened property by full credit bid at a nonjudicial foreclosure sale, and in each case, later sold the property at a loss. The appellate courts concluded that, based on the reasoning in *Cornelison*, the defendants could not be liable for damages. (*GN Mortgage Corp.* v. *Fidelity Nat. Title Ins. Co., supra*, 21 Cal.App.4th at p. 1808 ["The primary measure of damages for tortious acts against a secured lender is the extent of impairment of the security, i.e., the amount by which the indebtedness exceeds the actual value of the security. . . . A foreclosure sale establishes the actual value of the security. . . . Where the secured property is sold at auction for an amount sufficient to satisfy the indebtedness, there is no impairment of security and the secured party is not damaged. . . . Any damage suffered thereafter is not a proximate result of the fraudulent transaction." (Citations & fn. omitted.)]; *Western Fed. Savings & Loan Assn.* v. *Sawyer, supra*, 10 Cal.App.4th at p. 1618 ["The bank's causes of action for fraud and misrepresentation were destroyed by its full credit bid at the nonjudicial foreclosure sale which conclusively established its security was not impaired and it was therefore not damaged by the alleged misrepresentations in procuring the loan." (Italics omitted.)].)

■ In *Alliance*, the Supreme Court disapproved the holdings in *GN Mortgage Corp.* and *Western Fed. Savings & Loan Assn.*, and carved out a

limited exception to the full credit bid rule. The lender had contended that a real estate appraiser, a broker, and two title companies devised and implemented an elaborate scheme to fraudulently induce it to lend money ostensibly for the purchase of nine Bay Area residences. Defendants allegedly committed the following fraudulent acts: "prepared false residential purchase agreements and loan applications in the names of fictitious borrowers, deliberately inflated 'fair market value' property appraisals and invented 'comparable' property values to support the inflated and fraudulent appraisals, falsified employment and deposit verifications, tax returns, credit histories, and W-2 wage/income statements, drafted inaccurate title reports that contained misleading descriptions of the properties, and falsely represented that the escrow instructions had been followed and the required cash deposits and disbursements made." (*Alliance, supra*, 10 Cal.4th at p. 1232.) The "borrowers" defaulted on the loans shortly after they were made, and the lender purchased many of the properties at nonjudicial foreclosure sales by bidding the full credit value of the outstanding indebtedness on the notes, plus interest and costs. The lender brought claims for intentional misrepresentation, negligent misrepresentation, breach of contract and breach of fiduciary duty, breach of title insurance contract, and violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968).

The trial court limited the lender's damage claims under the full credit bid rule based on then existing authority. The appellate court reversed, expressly disagreeing with *GN Mortgage Corp.* and *Western Fed. Savings & Loan Assn.* "The [appellate] court reasoned that a 'full credit bid does not establish the value of the property for all purposes, but only for the purpose of foreclosure proceedings against a borrower,' and hence had no application to claims against third party tortfeasors. It concluded that '[t]he central error of *Western Federal, supra*, and *GN Mortgage, supra*, is the failure to appreciate that because the full credit bid rule was conceived only to further the debtor protection purposes of the antideficiency statutes, it has no application in actions against parties not sued as debtors. The statement in *GN Mortgage* that the rule is simply 'concerned with damages and proximate causation' and 'is independent of the antideficiency statute' [citation] is wrong. It is inconceivable the Supreme Court anticipated the rule it announced in *Cornelison* would be used to insulate third party tortfeasors from liability for fraudulent conduct, as was done below." (*Alliance, supra*, 10 Cal.4th at p. 1245.) "The [appellate] court also found that *Western Federal* and *GN Mortgage* erred in concluding that the measure of damages for fraud is the impairment of the security. Rather, the court concluded that damages for fraud by a fiduciary (which it concluded defendants were) are measured by sections 3333 and 1709, and in particular, the 'benefit-of-the-bargain,' not the 'out-of-pocket,' rule." (10 Cal.4th at p. 1245.)

The Supreme Court undertook review "solely on the issue of whether a lender's acquisition of security property by full credit bid at a nonjudicial foreclosure sale bars the lender from maintaining a fraud action to recover damages from nonborrower third parties who fraudulently induced the lender to make the loans." (10 Cal.4th at p. 1234.) Specifically, the court considered whether as a result of its full credit bids, the lender "could demonstrate neither justifiable reliance nor actual damages," both essential elements of fraud. (*Id.* at p. 1246.)

The court began by discussing reliance: "As with any purchaser at a foreclosure sale, by making a successful full credit bid or bid in any amount, the lender is making a generally irrevocable offer to purchase the property for that amount. [Citation.] The lender, perhaps more than a third party purchaser with fewer resources with which to gain insight into the property's value, generally bears the burden and risk of making an informed bid. [¶] It does not follow, however, that being intentionally and materially misled by its own fiduciaries[4] or agents as to the value of the property prior to even making the loan is within the realm of that risk. [Citation.] Most lenders, such as [plaintiff] in this case, are corporate entities, and rely on their agents to provide them material information. Here, [the lender] did obtain appraisals, and attempted to make informed loan decisions. It alleges, however, that its appraiser . . . in conspiracy with defendants, fraudulently misrepresented the nature of the properties and the existence and qualifications of the buyers, and that it did not discover the fraud until after it acquired title to the properties. The full credit bid rule was not intended to immunize wrongdoers from the consequences of their fraudulent acts." (10 Cal.4th at p. 1246, fn. omitted.)

The court recognized that the lender's difficulty resulted from its overvalued bid at the foreclosure sale. Had it become aware of the true value of the property and bid only what it was worth, there would have been no barrier to a later suit against the defrauding parties. The court, therefore, held that in order to establish reliance, the lender needed to demonstrate "that its *full credit bids* were a proximate result of defendants' fraud, and that in the absence of such fraud it would not, in all reasonable probability, have made *the bids*. [Citations.]" (10 Cal.4th at pp. 1246-1247, italics added.) "[T]o the extent [the lender's] *full credit bids* were proximately caused by defendants' fraudulent misrepresentations, and this reliance without independent or additional inquiry was either appropriate given the context of the relationship or was not otherwise manifestly unreasonable, [the lender's] bids cannot be deemed an admission of the properties' value" and "the full credit bid rule would not apply." (*Id.* at p. 1247, italics added.)

---

[4]The lender had pled that all the defendants were fiduciaries.

The court then went on to the subject of damages. The defendants' position that the lender had suffered no actual damages under *Cornelison*, was "dependent on [the] assumption that the measure of damages for fraudulent inducement of a loan is the impairment of the lender's security or the balance of the outstanding indebtedness." (10 Cal.4th at p. 1249.) With this the court did not agree: "[The lender] does not allege here that defendants impaired its security or caused the value of the properties to decrease *after* the loans were made. Rather, it alleges that defendants' intentional misrepresentations regarding the properties' characteristics and values induced it to make loans that far exceeded the properties' actual worth *at the time the loans were made*, and that as a result of these misrepresentations [the lender] purchased the properties." (*Ibid.*, original italics.)

In light of that distinction, the court described the appropriate damages: "The damages for such fraud are measured not by the outstanding indebtedness, but by either [the lender's] out-of-pocket and consequential damages under section 3343 or under section 3333 [of the Civil Code], depending on whether defendants stand in a fiduciary relationship to [the lender]. . . . We have previously held that a plaintiff is only entitled to its actual or 'out-of-pocket' losses suffered because of fiduciary's negligent misrepresentation under section 3333. [Citations.] While the measure of damages under section 3333 might be greater for a fiduciary's *intentional* misrepresentation, we need not address that issue here. [Citations.] The question before us is whether [the lender] stated a fraud claim that survives a motion for judgment on the pleadings. [The lender] alleges at least out-of-pocket damages when it alleges that it paid more for the properties than they were worth, and incurred certain consequential damages. [Citation.] Accordingly, its full credit bids do not establish as a matter of law that it sustained no actual damages." (*Alliance, supra*, 10 Cal.4th at pp. 1249-1250, original italics.)

IV

APPELLANTS' RELIANCE ON THE APPRAISAL

Appellants contend that they fit within the *Alliance* exception to the full credit bid rule. They mistakenly believe, however, that after *Alliance* "the full-credit bid rule has no application in an action for misrepresentation as to the value of the property against a non-borrower, such as an appraiser." The court was clear in *Alliance* that the exception to the full credit bid rule would apply only "to the extent [the lender's] full credit bids were proximately caused by defendants' fraudulent misrepresentations, and this reliance without independent or additional inquiry was either appropriate given

the context of the relationship or was not otherwise manifestly unreasonable . . . ."[5] (10 Cal.4th at pp. 1246-1247.)

In other words, in order to avoid the full credit bid rule, the lender must have been induced to enter into the loan by the false representation, *and* still be under the mistaken belief that the representation was true at the time it makes the full credit bid. Here appellants alleged the former—that they were induced to enter into the loan agreement with Edelman by respondent's intentional or negligent misrepresentations—but not the latter. Their complaint does not contain an allegation that they were induced to make their $652,000 bid on the property in 1994 in reliance on respondent's representations as to the value of the property in 1991 and 1992.

Moreover, as the trial court ruled, any reliance on the 1992 appraisal at the time of the foreclosure sale would have been manifestly unreasonable. Appellants obtained a reappraisal of the property, which placed its value at $375,000 ($410,000 if the adjacent vacant lot were to be included). To rely on an old appraisal when a recent one had been prepared expressly to resolve the issue of value at the time of foreclosure is manifestly unreasonable.

Appellants insist that, had the trial court permitted them to go forward, they could have established that they had no actual knowledge of either the appraisal or the basis for the motion for relief from stay. They contend that the knowledge of their bankruptcy attorneys cannot be imputed to them to preclude reliance on respondent's alleged actual fraud, citing cases in which courts held that claimants' constructive knowledge of the contents of public records did not preclude reliance on defendants' fraudulent representations. (See, e.g., *Bishop Creek Lodge* v. *Scira* (1996) 46 Cal.App.4th 1721, 1734 [54 Cal.Rptr.2d 745] ["Under a long line of cases, the fact that the victim had constructive notice of the truth from public records is no defense to fraud. The existence of such public records may be relevant to whether the victim's reliance was justifiable, but it is not, by itself, conclusive. [Citations.]"]; *Grange Co.* v. *Simmons* (1962) 203 Cal.App.2d 567, 577 [21

---

[5]The position espoused by appellants was urged by Justice Werdegar, joined by Justice Lucas, in a concurring opinion in which she said: "I write separately to discuss what I believe to be an unwarranted limitation, in the majority opinion, on the damages [the lender] may recover if its bids were not made in justifiable reliance on defendant's misrepresentations. In my view, [the lender] can establish a cause of action for fraud by showing it justifiably relied on defendants' misrepresentations *in making the loans*, regardless of whether it was also justified in later making full credit bids for the security properties. In such an action it may recover, at least, the amounts it is actually out of pocket as a result of making the loans." (*Alliance, supra,* 10 Cal.4th at p. 1251, original italics.) "The majority . . . hold[s] [the lender] may not recover its full out-of-pocket damages if its decision to make full credit bids was manifestly unreasonable, *regardless of whether making such bids actually increased* [*the lender's*] *damages.* . . . It is this portion of the majority opinion with which I disagree." (*Id.* at p. 1252, original italics.)

Cal.Rptr. 757] ["A person who is victimized by a fraudulent misrepresentation is not held to constructive notice of a public record which would have revealed the true facts, as the purpose of the recording acts is to protect bona fide purchasers for value and not those who indulge in fraud. [Citations.]"].)[6]

Whatever the merits of appellants' argument as it relates to imputed knowledge, the information involved here was not buried in the county recorder's office or in an attorney's files. The appraisal report was submitted on appellants' behalf to convince the bankruptcy court that there was no equity to protect on behalf of the debtor's estate and to gain advantage for them in a court of law. We thus consider not merely imputed knowledge but also whether appellants should be estopped to deny knowledge of the report.

■ The doctrine of judicial estoppel " 'precludes a party from asserting a position in a judicial proceeding which is inconsistent with a position previously successfully asserted by it in a prior proceeding,' " and " 'prevent[s] the use of intentional self-contradiction as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.' [Citation.]" (*Billmeyer* v. *Plaza Bank of Commerce* (1995) 42 Cal.App.4th 1086, 1092 [50 Cal.Rptr.2d 119], quoting *Southmark* v. *Trotter, Smith & Jacobs* (1994) 212 Ga.App. 454 [442 S.E.2d 265, 266-267].) In *Billmeyer*, a bankrupt company failed to report as an asset a potential claim against its lender and then sued the lender separately contending that its tortious behavior caused the bankruptcy. The court affirmed a judgment in favor of the lender based in part on judicial estoppel. Relying on *Billmeyer* and other authorities, this court recently held that an employee who claimed to be totally disabled from performing any of his job functions for purposes of a disability claim could not thereafter pursue a wrongful termination claim based on his ability to perform light duties. (*Drain* v. *Betz Laboratories, Inc.* (1999) 69 Cal.App.4th 950, 955-960 [81 Cal.Rptr.2d 864]; see also *Jackson* v. *County of Los Angeles* (1997) 60 Cal.App.4th 171, 183 [70 Cal.Rptr.2d 96] [Holding that the doctrine of judicial estoppel should apply when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. [Citations.]"].)

■ The doctrine has equal applicability here. Appellants cannot be permitted to, on the one hand, obtain the right to foreclose on a piece of property by assuring the bankruptcy court and the chapter 7 trustee that it is worth less than its liens, and then complain in a later suit that they were

---

[6]Appellants do not explain how this would lead to revival of their negligence or negligent misrepresentation claims.

surprised by their inability to make a huge windfall profit on it. To allow appellants to press forward with their claim would reward them for an improper attempt to capture equity which, had it existed, rightfully belonged to the debtor's estate. The possibility that they might not have been aware of their counsel's specific arguments to the court does not make them innocent bystanders. They accepted the benefits of their counsel's representations to the court and went ahead with the foreclosure and resale. For purposes of judicial estoppel, their actual knowledge is irrelevant.

V

## APPELLANTS' DAMAGES

Since the lack of justifiable reliance at the time of the foreclosure bid means that appellants cannot bring themselves within the *Alliance* exception, the full credit bid rule does apply. Appellants alternatively contend, however, that they did not make a full credit bid and are entitled to recover either out-of-pocket damages or benefit-of-the-bargain damages.

Turning first to the correct measure of damages, where the lender does not make a full credit bid at the nonjudicial sale, it is permitted to go forward with its tort claims. (See, e.g., *Evans* v. *California Trailer Court, Inc., supra,* 28 Cal.App.4th at p. 556; *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 139.) Under *Cornelison,* a case involving the tort of waste, the court stated that a lender that did not make a full credit bid "may recover damages for waste in an amount not exceeding the difference between the amount of his bid and the full amount of the outstanding indebtedness immediately prior to the foreclosure sale." (*Cornelison* v. *Kornbluth, supra,* 15 Cal.3d at p. 607.) The court considered this the best measure of impairment of security. This principle was followed in *Glendale Fed. Sav. & Loan Assn.,* where the tort involved fraudulent diversion of construction loan funds to other uses and the plaintiff/lender had not made a full credit bid. The court held that the amount of the indebtedness should be construed as a "ceiling" on the lender's damage recovery because: "As we have heretofore noted, the impairment of [the lender's] security resulting from the fraudulent diversion of the loan funds is analogous to the impairment of security for 'bad faith' waste committed by a trustor." (66 Cal.App.3d at p. 147.)

Appellants believe that the Supreme Court's decision in *Alliance* limits the *Cornelison* rule to waste claims and permits a greater recovery where the tort alleged is fraud. They point to the court's discussion in *Alliance* of what would happen where the lender's "full credit bids were not

proximately caused by defendants' fraudulent misrepresentations, or its reliance without independent or additional inquiry was either inappropriate given the context of the relationship or was otherwise manifestly unreasonable . . . ." (10 Cal.4th at p. 1247.) In that situation, the court said: "The full credit bid rule applies, and [the lender's] bid would then constitute an irrevocable offer to purchase the property for that amount. [Citation.] Hence, under these circumstance, [the lender] would not be entitled to recover the difference between its bid, which by definition is 'an amount equal to the unpaid principal and interest of the mortgage debt, together with the costs, fees and other expenses of the foreclosure,' and the actual value of the property. [Citation.] *It would, however, still be able to recover any other damages flowing from the defendants' fraud.*" (*Id.* at pp. 1247-1248, italics added.)

Appellants also cite *Foggy* v. *Ralph F. Clark & Associates, Inc.* (1987) 192 Cal.App.3d 1204 [238 Cal.Rptr. 130] for the proposition that in an action by a lender for fraud in the inducement, the measure of damages is not defined by the impairment of security. Plaintiff there made a loan of $200,000 in return for a second deed of trust on a house appraised at $610,000. There was an existing $255,000 first deed of trust. When the borrower defaulted on both the first and second loans, the plaintiff obtained the property in foreclosure apparently by paying $10,000 cash and arranging with the first deed holder to keep the $255,000 loan current. (192 Cal.App.3d at p. 1208.) He incurred expenses of fixing up the property for resale, making payments on the loan, insuring the property, and paying property taxes. The court held that the plaintiff could recover these "consequential" damages from the appraiser. (*Id.* at p. 1217; see also *Romo* v. *Stewart Title of California* (1995) 35 Cal.App.4th 1609, 1619 [42 Cal.Rptr.2d 414] ["Damages that may be recovered in a fraud or negligence action are considerably broader than those recoverable for impairment of security. A tort victim . . . is entitled to compensatory damages for any actual loss, as well as punitive damages for fraud (if the fraud consisted of an intentional misrepresentation or concealment. [Citation.]"].)

We agree that these authorities indicate that damages for fraud should be calculated somewhat more expansively than damages for waste. However, we do not read either *Alliance* or *Foggy* to mean that the benefit-of-the-bargain measure of damages is appropriate. As we have seen, in discussing the issue of damages, the court in *Alliance* said: "The damages for such fraud are measured not by the outstanding indebtedness, but by either Alliance's

out-of-pocket and consequential damages under section 3343 or under section 3333 [of the Civil Code[7]], *depending on whether defendants stand in a fiduciary relationship to [the lender]." (Alliance, supra,* 10 Cal.4th at p. 1249, italics added.) Thus, the Supreme Court is clearly of the view that damages for fraud which induces the making of a real estate loan, whether sought under section 3343 or section 3333, will be limited to the plaintiff's out-of-pocket losses, plus any consequential damages, unless the defendant is a fiduciary.[8]

Reviewing the actual damages suffered by appellants, they state in their brief that "the amounts actually and reasonably expended include attorneys' fees, foreclosure expenses, sums advanced to maintain the property and to maintain insurance and taxes, and other expenses . . . ." However, they do not state that the total expended for these categories of expenses when added to the $475,000 loan and the unpaid interest total more than their $652,000 bid at the foreclosure sale. As we have discussed, the winning bid at the private foreclosure sale is deemed to be the fair market value of the property.

The record does not provide any further illumination. The trial court asked appellants to provide a written offer of proof on damages. Appellants stated in their brief that their "actual out of pocket losses and expenditures exceeded $600,000, taking into account principal, interest, costs, attorney's fees, taxes, etc." and that "the out-of-pocket loss was in the range of $200,000," but again did not explain how this $200,000 figure was calculated or whether their losses exceeded the $652,000 bid on the property.[9] If the appellants received a property with a value equal to or greater than their

---

[7]Civil Code section 3343 provides the measure of damages for fraud "in the purchase, sale or exchange of property"; section 3333 is the measure of damages for torts in general.

[8]Discussing fiduciary misrepresentations, the court stated: "While the measure of damages under section 3333 might be greater for a fiduciary's *intentional* misrepresentation, we need not address that issue here. [Citations.] The question before us is whether [the lender] stated a fraud claim that survives a motion for judgment on the pleadings. [The lender] alleges at least out-of-pocket damages when it alleges that it paid more for the properties than they were worth, and incurred certain consequential damages. [Citation.]" (*Alliance, supra,* 10 Cal.4th at p. 1250, original italics.)

[9]In their motion for relief from stay, appellants had stated the total outstanding balance on the loan was $581,335.85, including $475,000 in principal, $87,578.10 in interest, $8,757.75 in late fees, and $10,000 in legal fees.

In his initial trial brief, respondent contended that appellants' claimed out-of-pocket losses consisted of $475,000 in principal, $117,000 in interest, $11,000 in late charges, $28,000 for a "prepayment penalty," and $2,500 for a preforeclosure appraisal report, for a total of $663,122. This was the figure set forth as the "amount of the unpaid debt together with costs" in the trustee's deed upon sale, which also reported that "[t]he amount paid by the grantee at the trustee's sale" was $652,029. Respondent believed a more accurate description of out-of-pocket losses would be $475,000 principal, $12,000 preforeclosure insurance, $10,000 attorneys' fees, $2,500 reappraisal fee, $1,000 trustee's fee, and $117,549 unpaid loan interest, for a total of $618,049. Since late charges and prepayment penalties are not

damages, they have no basis to proceed, as the trial court ruled. Under these circumstances, we must assume that the trial court was correct when it found that "[appellants] neither claim nor intend to prove that their total monetary expenditures or losses (up through the date of foreclosure) exceeded $652,029.81."

Appellants complain the application of this damage rule to the present case is "incongruous" because "[appellants'] losses are virtually the same whether they purchase at foreclosure or not: they are simply mitigated by the $400,000 value of the property." We repeat the response of the court in *Pacific Inland Bank* v. *Ainsworth* (1995) 41 Cal.App.4th 277 [48 Cal.Rptr.2d 489] to a similar plaint: "We are sympathetic to [the lender's] position [that the appraiser] should not be allowed to escape liability. However, [the lender] was not precluded from acquiring the property at an amount far less than that owed, thus preserving its rights to seek damages from [the appraiser]. Moreover, it could have taken appropriate steps to ascertain the actual value of the properties before the trustee's sale. As noted in *Alliance*, 'The lender, perhaps more than a third party purchaser with fewer resources with which to gain insight into the property's value, generally bears the burden and risk of making an informed bid.' (*Alliance Mortgage Co.* v. *Rothwell, supra*, 10 Cal.4th 1226, 1246.) [The lender] has offered no explanation, nor can we think of any, why it should receive greater protection from its own carelessness than does an ordinary purchaser. This is particularly true in these situations where a lender-purchaser's full credit bid may discourage other cash bidders. [The lender] controlled the timing of the sale and was in the best position to discover the actual value of the properties. If the property increased in value, [the lender] would have been entitled to the benefit of its bid. It is reasonable for it to bear the burden. [Citation.]" (41 Cal.App.4th at pp. 283-284, fn. omitted [holding that *Alliance* is limited to fraud-based claims and that *Cornelison* and the full credit bid rule apply in all other situations].)

## VI

### EXPERT WITNESS FEES

■ Appellants raise a subsidiary issue concerning whether the trial court properly awarded $8,100 for expert witness fees where the expert witness was designated and apparently consulted with defense counsel but was never

out-of-pocket expenses, the latter calculation would appear to be more accurate. (See *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra*, 66 Cal.App.3d at p. 147, fn. 14 [late charges are not a proper component of fraud damages].) In any event, as we have said, these are respondent's calculations. Appellants did not provide any of their own.

deposed or called to testify in court. Respondent submitted a $20,000 settlement offer under Code of Civil Procedure section 998 and after the nonsuit was entered, sought to recover expert witness fees pursuant to subdivision (c)(1) which provides: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition, in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in preparation for trial or arbitration of the case by the defendant."

In the opposition to the motion to tax costs, respondent's counsel explained that they retained an expert appraiser who billed his time at $200 per hour and prepared three different appraisal reports on the two properties to track their value at various times. The cost of the appraisal reports and an update was over $7,000 and the remaining time was for telephonic discussions regarding the trial schedule. There is no time associated with the appraisal reports, which appear to have been done for a flat fee.

Appellants argue that the fees were awarded in violation of Code of Civil Procedure section 998, subdivision (h), which provides: "The costs for services of expert witnesses for trial under subdivisions (c) and (d) shall not exceed those specified in Section 68092.5 of the Government Code." Section 68092.5, subdivision (a) of the Government Code is the provision under which a party seeking testimony of another party's expert must pay "the reasonable and customary hourly or daily fee for the actual time consumed in the examination of that witness" which "shall not exceed the fee charged the party who retained the expert . . . ." In addition, "A daily fee shall only be charged for a full day of attendance at a deposition or where the expert was required by the deposing party to be available for a full day and the expert necessarily had to forego all business he or she would have otherwise conducted that day but for the request that he or she be available all day for the scheduled deposition."

Appellants emphasize that the expert was designated to testify as to the value of the subject property but was never deposed or called to testify. It has been held that recovery of expert witness fees under Code of Civil Procedure section 998 is not limited to actual time consumed in examination. (*Santantonio* v. *Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 123 [30 Cal.Rptr.2d 486].) "The reference to Government Code section 68092.5 in section 998, subdivision (h) is interpreted to mean that any fees

charged for trial time must not exceed the expert's normal rate." (*Santantonio* v. *Westinghouse Broadcasting Co.*, *supra*, at p. 123; accord, *Evers* v. *Cornelson* (1984) 163 Cal.App.3d 310, 317 [209 Cal.Rptr. 497].)

Appellants believe that the lack of itemization and the failure to express the costs of the appraisals in terms of hours expended should have resulted in denial of the request. We agree that section 68092.5 of the Government Code limits expert witness fees to reasonable and customary hourly rates, but believe the trial court had sufficient information to determine that the expert witness billings were within the statutory proscription. The trial court is charged with ensuring that parties are not charged more than a reasonable fee and must oftentimes work with less than perfect billing records. The declaration submitted in support of the fees charged explained the witness's hourly fee and what he had done. Appellants were free to calculate the number of hours by dividing the total fee charged by the hourly rate and attempt to demonstrate that this represented an excessive number of hours for the task of appraising two different properties at three different times. They did not do so. The trial court did not abuse its discretion in awarding the fees. (See *Marsh* v. *Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 303-304 [50 Cal.Rptr.2d 493] [determination of expert fee award is within the sound discretion of the trial court and the appellate court will interfere with that determination only if it finds that, under all the evidence viewed most favorably in support of the trial court's decision, no judge could reasonably have made the challenged order].)

DISPOSITION

The judgment is affirmed.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 30, 1999, and appellants' petition for review by the Supreme Court was denied September 22, 1999. Werdegar, J., was of the opinion that the petition should be granted.