Filed 7/17/24  Varga v. Twitch Interactive CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JAMES VARGA,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>TWITCH INTERACTIVE, INC.,<br><br>　　　Defendant and Respondent. | A166747<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-18-564337) |

Plaintiff James Varga appeals the judgment entered after a jury found in his favor on his claims against Twitch Interactive, Inc. (Twitch) for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligent representation.  He contends the trial court erred in denying his motion for a new trial pursuant to Code of Civil Procedure[1] section 657 because the jury's awards of contract damages and tort damages were inconsistent with the special verdict and inadequate as a matter of law.  He further asserts that the court abused its discretion in awarding Twitch nearly $170,000 in electronic discovery costs and that such costs are not recoverable under section 1033.5.  We conclude that remand is required for the court to redetermine the proper amount of Twitch's electronic discovery costs.  In all other respects, the judgment is affirmed.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

# I. BACKGROUND

We summarize the facts in the light most favorable to the judgment. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694.)

## A. The Parties' Agreement

Twitch is a video livestreaming service that provides gaming-related content. Varga is a popular live streamer (or "streamer") who initially broadcasted himself playing video games on a different platform. In 2012, when Twitch was still a new company, it recruited Varga to livestream as a partner. They entered into a "Content License and Base Network Agreement" (Agreement or Partnership Agreement), whereby Varga agreed to create video gaming-related content and grant Twitch an exclusive license to use that content in exchange for the right to access Twitch's media player and receive certain forms of revenue. The Agreement was for two years and would renew automatically for subsequent one-year terms unless either party provided 90 days' written notice prior to the end of the term.

The Agreement prohibited Varga from streaming content that was "unlawful, libelous, defamatory, pornographic or obscene," or that otherwise violated the "Content Guidelines" attached to the Agreement. The Content Guidelines listed "Prohibited Content and Subject Matter Types," including "X-rated material," hate speech, "content which promotes discrimination" or illegal activity, gambling, and "content that a reasonable person would deem objectionable, indecent, vulgar or offensive."

As relevant here, section 5.2 of the Agreement states, "If either Party materially breaches any of its obligations under this Agreement, the non-breaching party, at its option, shall have the right to terminate this Agreement by written notice to the breaching Party unless, within thirty (30)

2

calendar days after receipt of written notice of such breach by the breaching Party, the breaching Party cures such breach."

## B. *Twitch's Terms of Service*

Separate from the Agreement, everyone who created a Twitch account was required to agree to the terms of service, which prohibited users from broadcasting non-gaming content and content that "a reasonable person could deem objectionable, offensive, indecent, pornographic, . . . hateful, racially or ethnically offensive, or otherwise inappropriate."

Despite the terms prohibiting non-gaming content, it was undisputed that Twitch had an informal policy permitting the livestreaming of "CS:GO gambling" (also referred to as "skins gambling") content for up to 30 minutes at a time. CS:GO skins gambling refers to "a form of gambling in which players wager virtual in-game items [or 'skins'] from the game Counter-Strike Global Offensive."

## C. *Varga's Violations of the Content Guidelines and Terms of Service*

Twitch's moderation team enforced the terms of service and Content Guidelines. When the team received reports from users about a streamer possibly violating the terms of service or Content Guidelines, it would independently verify that a violation had occurred. If the team verified a violation, it would escalate the matter to the "partner conduct" team. The partner conduct team would then "vet the evidence, discuss amongst [them]selves, if there's need for discussion, kind of building a consensus, and then tak[e] the appropriate action of warning [the streamer] or suspending" the streamer's account. Where, as here, the streamer is a partner, the

3

partner's account manager may be involved in the decision, as "they're the advocate for that partner."

In Varga's case, the moderation team escalated "approximately" 34 violations to the partner conduct team, consisting in part of 16 "sexual or pornographic" violations and seven "gambling" violations. These violations included Varga "grop[ing] his girlfriend's breast" while streaming, showing a video of a woman stimulating a sexual act, posting an image of a swastika, and, on numerous occasions, violating the rule limiting CS:GO skins gambling content to 30 minutes.

Several Skype messages were produced at trial showing that Varga's account manager, Jason Babo, had communicated to Varga that Varga was reported for violating the Agreement's Content Guidelines and the terms of service. While this evidence showed that Babo would often tell Varga to avoid the offending actions in the future, he also tended to minimize Varga's conduct. For example, on one occasion, Babo told Varga that him "licking" his dog's butt was "borderline" but did not break the terms of service. And on another occasion, after Babo told Varga that he was reported for "posting porn links," Babo reassured him that he would not be banned. In other instances, he characterized Varga's conduct as "silly politics" or "funny as shit." These communications occurred between April 2013 and June 2016.

### D. Twitch's Suspension of Varga's Account

In June 2016, Babo informed Varga that he received "7-8 reports of diff[erent] things." He said he was told "1 more slip up you get a 48h[our] ban." Less than a week later, Babo told Varga that "you may get suspended" because "you were found groping your girlfriend (again) on stream." Twitch thereafter suspended Varga's account for 52 hours.

4

Shortly after his temporary suspension was lifted, Varga livestreamed a 29-hour skins "giveaway," during which he was "giving away $100,000 worth of [CS:GO] skins" on his channel. Varga made several sexually suggestive comments during the livestream. The giveaway also resulted in numerous fraudulent chargebacks from users who paid with a credit card to enter the giveaway and then rescinded the payment after the giveaway.

A few weeks after the giveaway, a video game blogger, Richard Lewis, published a post claiming that Varga was the owner of a CS:GO gambling website that Varga regularly promoted on his channel. Lewis further asserted that Varga "gambled exclusively with house money taken from the business" and "rig[ged the] outcomes." When Twitch learned of the report, the moderation team had a "conversation about [it]" because of concerns over the potential negative publicity. In the e-mail thread, Babo said he was "looking into it" and "had discovered what he felt was compelling information that . . . the information was valid." The partner conduct team did not otherwise investigate Lewis's allegations.

A couple of days later, Twitch notified Varga via e-mail that his account had been banned "for violating the following category: Other Terms of Service Violation." The e-mail did not provide further details as to the reason for Varga's suspension.

Varga subsequently contacted Babo about the basis for his suspension, but Babo "didn't really pinpoint anything specifically." Varga reached out to another Twitch employee, who told him the reason for his suspension was "false subscribers." Varga then contacted Twitch's legal department but received no answer until his attorney sent a letter to Twitch asserting that Varga's suspension was improper.

In response to the letter, Twitch attributed Varga's suspension to his "long history of multiple violations of Twitch's TOS, . . . and the Content Guidelines included in the Agreement," including the prohibition on gambling and streaming "sexually suggestive content." In a subsequent letter, Twitch again cited Varga's history of violations and said that "the final breach that led to the termination of the Agreement and the suspension of the account" was the "skins giveaway." It claimed that even if Varga was entitled to damages for the suspension, his damages would be limited by section 5.2 of the Agreement, which allowed Twitch to terminate the Agreement upon 30-days' notice for Varga's "material[] breach[]" of the Agreement.

At the time Twitch suspended Varga's account, there were approximately nine months remaining on the Agreement.

### E. The Parties' Allegations

In February 2018, Varga sued Twitch for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation, and violation of section 17200 et seq. of the Business and Professions Code. He asserted that Twitch materially breached the Agreement by suspending his account "without notice, opportunity to cure, or cause." He further alleged that Twitch breached the implied covenant of good faith and fair dealing by representing to Varga that he was permitted to broadcast non-gaming content and then suspending his account due to his non-gaming content. Varga's misrepresentation claims are based on the same alleged representations.

Twitch filed a cross-complaint. Its operative second amended cross-complaint asserted causes of action against Varga for breach of contract,

6

negligent misrepresentation, and fraud. Twitch alleged that Varga breached the Agreement and terms of service by, among other things, streaming non-gaming content, sexually explicit content, hate speech, and promoting illegal gambling activity. Twitch further claimed that Varga misrepresented or omitted information regarding his ownership in a CS:GO gambling website, and that he was "rigging jackpots" and manipulating the results.

### F. Jury Verdict

The jury returned a special verdict in April 2021, finding in favor of Varga on his breach of contract, breach of the implied covenant of fair dealing, and negligent misrepresentation claims. The jury awarded Varga $20,720 in contract damages and $0 in tort damages.

The jury did not find for Twitch on any of its claims. For Twitch's contract claims, the jury found that Twitch did not perform under the Agreement and had "freely and knowingly [given] up its right to have Varga perform" under the terms of service. Regarding Twitch's intentional misrepresentation claim, the jury found that while Varga made false representations to Twitch, Twitch's reliance on the representations was not reasonable.

### G. Post Trial Proceedings

After the verdict, Varga moved for additur or, in the alternative, a new trial. He argued first that a new trial was required because the jury's award of contract damages was inadequate, as it limited the damages to the 30-day notice period under section 5.2 of the Agreement for terminating the Agreement early instead of accounting for at least the nine months remaining under the Agreement. He further argued that the jury's award of $0 for his

7

tort claims was unsupported by the evidence and fatally inconsistent with the jury's finding that Twitch's negligent representations harmed him.

In opposition, Twitch argued that the jury's limitation of damages to the 30-day notice period under section 5.2 of the Agreement was supported by evidence showing he repeatedly violated the Agreement. Twitch also contended that the jury awarded $0 in tort damages because it was attempting to avoid duplicative damages.

The court denied the new trial motion, concluding the jury "reached precisely the correct result," as the evidence showed Varga breached the Agreement. "Indeed it is entirely implausible that, had Twitch decided to afford 30 days' notice, Twitch would not then have immediately terminated Varga." The court further concluded that an award of $0 in tort damages was "entirely reconcilable" with a finding of liability on Varga's negligent misrepresentation claim, because the evidence showed "that Varga suffered no more as a result of the tort than as a result of the contract breach, and the jury was instructed not to award duplicative damages."

Thereafter, the parties filed competing memorandums of costs, with Twitch seeking costs pursuant to section 998. Varga moved to strike or tax some of the costs claimed by Twitch, including electronic discovery costs. The court awarded Twitch nearly $400,000 in costs and entered judgment in favor of Twitch.

## II. DISCUSSION

### A. New Trial Motion

We begin with Varga's challenge to the trial court's ruling on the new trial motion. As he did in the trial court, Varga contends the awards of

8

contract damages and tort damages were inadequate and inconsistent with the special verdict.

### 1. *Legal Principles*

"The authority of a trial court in this state to grant a new trial is established and circumscribed by statute." (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.) As relevant here, the statutory grounds for a new trial include "inadequate damages" and a verdict that is against the law. (§ 657, subds. (5), (6).)

Under section 657, subdivision (6), inconsistent verdicts are against the law and are therefore grounds for a new trial. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682.) " 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence.' . . . Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law." (*Ibid.*) "[A] special verdict's correctness is analyzed as a matter of law and [is] therefore subject to de novo review." (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*).)

Where a new trial motion is based on inadequate damages under subdivision (5) of section 657, the trial court sits as a "thirteenth juror" and is free to reweigh the evidence. (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 900; § 657, subd. (5).) We reverse the denial of a motion for a new trial based on inadequate damages " 'only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted.' " (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1416; see *Uva v. Evans* (1978) 83 Cal.App.3d 356, 364–365 [reversal required under subdivision (5) of section 657 where damages

9

award was "without evidentiary support"], disagreed with on another ground by *Jones v. Interstate Recovery Service* (1984) 160 Cal.App.3d 925, 929–930.)

### 2. Contract Damages

For Varga's breach of contract claim, the jury awarded him damages for the 30-day period following the suspension of his account. The jury also found by special verdict that while Varga did not substantially perform under the Agreement, he was "excused from having to do all, or substantially all, of the significant things that the . . . Agreement required him to do." Varga contends this finding necessarily means the jury found he did not breach the Agreement, and thus Twitch had no grounds to terminate the Agreement early under section 5.2, which, as mentioned, allows a party to terminate the Agreement with a 30-day notice only upon the other party's "material[] breach[]." Therefore, he claims the jury improperly limited his contract damages to the 30-day notice period under the Agreement, and the damages award was inadequate as a matter of law. We disagree.

### a. Relevant Damages Evidence

Twitch's damages expert, Krista Holt, testified at trial. She said she "projected the revenues" that Varga would have received from the date his account was suspended and subtracted his expenses to obtain his profits. The sources of revenue she identified for Varga were user donations, Twitch subscriptions and advertisements, and sponsorships.

She calculated Varga's projected revenues based on two different time periods. The first time period was the nine months remaining under the Agreement after Twitch suspended Varga's account. She calculated damages for that period as totaling $160,461.

The other time period for which Holt calculated Varga's damages was based on the 30-day notice period under section 5.2 in the Agreement. She

10

said that "if the trier of fact were to decide that there was the potential for a cure and that a cure could have happened, then there's a 30-day period that Mr. Varga would have still been on Twitch if that were possible." She calculated Varga's damages for the 30-day notice period as totaling $16,082.

Dr. Barry Ben-Zion, Varga's expert in forensic economics, testified that he calculated Varga's "past" economic damages for the period of July 17, 2016—the date Varga's account was suspended—to March 28, 2021, the date he was told was the first day of trial. For this time period, he calculated Varga's damages as totaling over $35 million.

In closing arguments, Twitch's counsel argued that if the jury found Twitch liable to Varga for damages, the jury should base the damages on Holt's "reality-based projections. That means if you find that Twitch's only fault was not giving 30-days notice, give him what he would have gotten for 30 days."

### b. *The Special Verdict*

The special verdict at issue is quoted below with the jury's answers indicated.

"1.  The parties have agreed that they entered into the [Agreement]. . . .

"2.  Did Varga do all, or substantially all, of the significant things that the . . . Agreement required him to do?

" . . . No.

"3.  *Was Varga excused from having to do all, or substantially all, of the significant things that the . . . Agreement required him to do*?

"*Yes . . . .*

"4.  Did Twitch breach the . . . Agreement, meaning did Twitch either: (a) fail to do something that the . . . Agreement required it to do; or (b) do something the . . . Agreement prohibited it from doing?

11

"Yes . . . .  [¶] . . . [¶]

"5.  Was Twitch's breach(es) of the . . . Agreement excused by Varga's prior material breach of the . . . Agreement?

" . . . No.  [¶] . . . [¶]

"6.  Was Varga harmed by Twitch's breach(es) of the . . . Agreement?

"Yes . . . ."  (Italics added.)

The jury awarded Varga a total of $20,720.34 for his breach of contract claim.  It identified the time period the damages related to as the "First 30 Days (July 19, 2016–August 18, 2016)."

### c. Analysis

Although Varga contends the contract damages award is inadequate under subdivision (5) of section 657, implicit in his position is that the jury's finding that Varga was excused from substantially performing under the Agreement is inconsistent with a finding that Twitch's only breach of the Agreement was a failure to provide Varga a 30-day notice under section 5.2 to terminate the Agreement for his material breach.[2]  He seems to suggest that based on the jury's finding that he was excused from performing, Twitch had no grounds to terminate the Agreement early under section 5.2, and thus it breached the Agreement by terminating the Agreement without cause, in which case Varga would be entitled to damages for the nine months remaining on the Agreement.  Under those circumstances, the evidence established that Varga's damages would amount to at least eight times the amount of the damages award.  (See *Ryan v. Crown Castle NG Networks, Inc.*

---

[2] For the first time in his reply brief, Varga contends the award of contract damages is also inconsistent with the jury's finding on question 5 of the special verdict form.  But question 5 does not ask the jury to determine whether Varga committed a material breach; it asks only whether Twitch's breach of the Agreement was "excused by Varga's prior material breach."

12

(2016) 6 Cal.App.5th 775, 787–789 [damages award lacked factual basis where undisputed evidence established that the plaintiff's damages amounted to over four times that amount], disagreed with on another ground by *Huy Fong Foods, Inc. v. Underwood Ranches, LP* (2021) 66 Cal.App.5th 1112, 1125–1126.)

We observe, however, that the special verdict form did not require the jury to specify the breach. Since Varga asserted multiple theories of breach, we treat the jury's finding of breach as tantamount to a general verdict and draw all reasonable inferences that support the verdict. (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24; see *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540, overruled on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.) So long as a theory of breach is consistent with the jury's special findings and supported by substantial evidence, we may conclude that the jury believed that theory. (*Jonkey v. Construction Co.*, at pp. 25–26; accord, *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193.) That is the case here.

On the face of the special verdict, the jury's findings are consistent with the theory that Twitch breached the Agreement by failing to provide a 30-day notice of termination based on Varga's material breach. Question 3 in the special verdict form asks whether Varga was "excused from having to do all, or substantially all, of the significant things that the . . . Agreement required him to do," while, in contrast, question 4 defines "breach" as "(a) fail[ing] to do something that the . . . Agreement required [the party] to do; ***or*** (b) *do[ing] something the . . . Agreement prohibited [the party] from doing*." (Italics and bold added.) Based on this definition of breach, question 3 in the special verdict form did not ask the jury to specifically determine which type of breach was excused. Thus, the jury could have concluded that while Varga

13

was excused from performing under the Agreement, Twitch still had cause to terminate the Agreement early under section 5.2 because Varga did something prohibited by the Agreement.

Consistent with the special verdict form's language, the court instructed the jury that for Varga to prevail on his contract claims, he would need to prove that he "did all or substantially all of the significant things that the contract required him to do, or *was excused from having to broadcast content on Twitch's media player*." (Italics added.) That instruction obviously required the jury to find that Varga was excused specifically from broadcasting content on Twitch's media player. Such a finding would not conflict with a finding that Varga materially breached the Agreement by doing something prohibited by the Agreement. In finding that Varga was excused from doing the "significant things" required of him under the Agreement, we must presume the jury followed the jury instruction in making this finding. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803–804.)

Varga interprets the special verdict differently. He seems to contend that question 3 in the special verdict form reflects a finding that Twitch excused or waived *all* his violations, and thus it had no basis to terminate the Agreement under section 5.2. He points out that when the jury sought clarification on how to determine whether Varga was "excused," the court instructed the jury that "Party A" may be excused where, among other things, "Party B accepts Party's A's actions (or failure to act)." Thus, Varga claims, the jury, in answering question 3, made a finding that Twitch accepted his "improper actions" because the evidence shows Twitch "repeatedly" assured him that he was permitted to take those actions or

14

declined to discipline him for his violations of the Agreement's Content Guidelines.

When a court is called upon to interpret a special verdict, the verdict should be interpreted, if possible, to uphold it and give it the effect intended by the jury as well as one consistent with the law and the evidence. (*All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223.) A reversal is required if the special verdict is " ' "hopelessly ambiguous" ' " or inconsistent. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 300.) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357 (*Singh*).)

If, on the other hand, the verdict is "merely ambiguous," the court may properly interpret the verdict " 'from its language considered in connection with the pleadings, evidence and instructions.' " (*Zagami, supra*, 160 Cal.App.4th at p. 1092 & fn. 5, citing *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456; see *Singh, supra*, 186 Cal.App.4th at p. 358 [court must attempt to resolve any inconsistency "in light of the jury instructions and the evidence"].) "[I]f any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424, disagreed with on another ground by *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 982–983.)

Preliminarily, we note that the parties spend much of their briefing on the issue of whether a finding that a party was excused from performing under a contract is equivalent to a finding that the party did not breach the contract. The authority Varga relies on appears to concern the rule that a party who is excused from performing its obligations under the agreement

15

does not thereafter breach the agreement by failing to perform those obligations. (See, e.g., *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 550; *Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 227.) But where a breach has already occurred, the other party has "the right and option to determine what remedy he will pursue" (*B.L. Metcalf General Contractor, Inc. v. Earl Erne, Inc.* (1963) 212 Cal.App.2d 689, 693), unless that party knowingly and intentionally opts to " 'keep the contract alive, for the benefit of both parties,' " thereby waiving the breach (*Alder v. Drudis* (1947) 30 Cal.2d 372, 381; see *Gould v. Corinthian Colleges, Inc.* (2011) 192 Cal.App.4th 1176, 1179).

Here, apart from some of Varga's purported violations of the rule against non-gaming content, it is undisputed that he repeatedly violated the Agreement's Content Guidelines. The evidence shows that Babo communicated with Varga about most (if not all) of those violations after the fact. Thus, in our view, the pertinent question is whether the jury made a finding that Twitch had waived its right under section 5.2 of the Agreement to terminate the Agreement. (See *Neet v. Holmes* (1944) 25 Cal.2d 447, 458 ["Waiver of a right to rescind [a contract] will be presumed against a party who" knowingly accepts the benefits of the contract].) We think not, considering the jury was never asked to determine whether Twitch knowingly and intentionally waived its right to terminate the Agreement. (See *Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 959 [party waives a contractual right when its conduct is "so inconsistent with any intent to enforce the right as to induce a reasonable belief that it has been relinquished"].)

In any event, to the extent the jury instructions on excuse created an ambiguity, the special verdict's language and the evidence demonstrates that

the jury's findings can be reconciled with the award of contract damages. Contrary to Varga's suggestion, the verdict form did not ask the jury whether Twitch excused (or waived) "all" of his contractual breaches. Rather, it asked whether he was excused from performing "all, *or substantially all*, of the significant things that the . . . Agreement required him to do." (Italics added.) As far as we can tell, the court did not provide the jury a definition of the term "substantially all" as used in question 3; it instead told the jury to "use its own sense of the term," permitting the jury to interpret it broadly. Thus, the jury could have concluded that Twitch accepted many but not all of Varga's violations. If Varga wanted the jury to answer a question with more specificity, such as whether Twitch had waived all his breaches, it was his responsibility to request such a finding. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530; see also *Little v. Amber Hotel Co.*, *supra*, 202 Cal.App.4th at p. 300 [where special verdict was " 'merely ambiguous,' " party forfeited her contention that award of damages could not be reconciled with special verdict for failure to seek clarification of the verdict before the jury was discharged].)

Further, the evidence compels the conclusion that Twitch did not waive its right to terminate the Agreement. Although Babo did little more than reprimand Varga for years, the undisputed evidence shows that in June 2016, he expressly warned Varga that one more "slip up" could result in a suspension. When Varga continued to violate the Content Guidelines, Twitch carried out this warning by temporarily suspending his account. After that suspension was lifted, Varga livestreamed his skins "giveaway," during which he made numerous sexually suggestive comments. Varga cites no evidence indicating that Twitch "accept[ed]" or waived those violations. Twitch

17

banned his account only a few weeks later.[3]  Thus, the record does not support a finding that Twitch waived its right under section 5.2 of the Agreement to terminate the Agreement.  (See *Budaeff v. Huber* (1961) 194 Cal.App.2d 12, 20 ["Being a continuing covenant, each breach, not thereafter waived, is itself a basis for forfeiture" of the contract].)  Rather, based on this evidence, the jury's response of "yes" to question 3 can, at most, be interpreted as a finding that Twitch "accept[ed]" many of Varga's prior breaches.

Varga further points out that the jury, in answering question 35 in the special verdict form, found that "Twitch freely and knowingly gave up its right to have Varga perform the obligations under the Terms of Service." However, as the trial court concluded, this was a finding on Twitch's contract claim regarding its waiver of Varga's breaches of the terms of service; it was not a finding that Twitch had waived its right under section 5.2 of the Agreement to terminate the Agreement.  Additionally, to the extent Varga is claiming that the jury's answer to question 35 is inconsistent with his award of contract damages, he has not developed the argument beyond comparing the terms of service to the Agreement's Content Guidelines.  " ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]." ' "  (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.)

---

[3] Based on testimony from a member of Twitch's moderation team, Varga contends the sole reason Twitch suspended his account was the negative publicity from the Lewis report.  However, that same employee testified that the "top reason" for the suspension was "the volume of incidents over the history of the account" and "the damage [Varga] was doing to, you know, our brand name and our community . . . ."

In sum, the special verdict form did not ask the jury to find that Twitch had waived its right to terminate the Agreement under section 5.2 of the Agreement. To the extent there was any ambiguity as to this issue, the record shows that the trial court's denial of the new trial motion is supported by the language of the verdict, the pertinent instructions, and the evidence, as we have discussed. We therefore reject Varga's argument that the contract damages award was inadequate.

### 3. *Tort Damages*

Varga next argues that the jury's award of $0 for his negligent misrepresentation claim warrants reversal because it is inadequate under section 657, subdivision (5), and against the law under section 657, subdivision (6). Twitch responds that the award was consistent with the evidence and the instruction to not award duplicative damages. We conclude that Twitch has the better argument.

### a. *The Alleged Misrepresentations*

Varga contends his negligent representation claim is based on the same facts as his contract claims because "Twitch unlawfully suspended him in violation of the . . . Agreement without notice and waived or excused" his breaches because it "misrepresented to him whether his conduct violated Twitch's rules or deserved suspension."

To show Twitch's alleged negligent representations, he cites the evidence adduced at trial showing Babo minimizing his conduct. As discussed above, this evidence included Babo telling Varga he would not be suspended after he posted "porn links," that Varga "licking" his dog did not violate the terms of service, and that Varga's conduct in other instances was "borderline" or "funny as shit." Varga also cites evidence showing that Twitch permitted him to engage in CS:GO skins gambling for no more than

19

30 minutes at a time, but because the rule was unclear as to whether it was 30 minutes in one day or 30 minutes consecutively, Varga was reported for violating the rule by "go[ing] back and forth" between different streams.

### b. *The Jury Instructions on Damages*

After the close of evidence at trial, the court instructed the jury on damages as follows: "[E]ach item of damages may only be awarded once, regardless of the number of legal theories alleged. You will be asked to decide whether Twitch is liable to Varga under the following legal theories: Breach of contract, breach of the implied covenant of good faith and fair dealing, intentional misrepresentation, and negligent misrepresentation. [¶] The following items of damages are only recoverable once under all of the above legal theories: 1, past economic [loss]; . . . 2, future economic loss; for example, lost earnings, lost profits, . . . and other economic loss; 3, other economic loss; for example, loss of earning capacity; and 4, special damages."

### c. *The Special Verdict*

The jury found by special verdict that Twitch made false representations of fact to Varga, that Twitch did not have reasonable grounds for believing the false representations were true, that Varga reasonably relied on the negligent representations, and that Varga's reliance on the negligent representations was "a substantial factor in causing harm to [him]."

In the damages portion of the verdict form, the section for contract damages was presented first. It stated, "Each item of damages may be awarded only once as to this question, regardless of the number of legal theories, such as contract or implied covenant, alleged." The jury wrote in $15,139.34, $3,060, and $2,521 for past lost earnings, loss of donations, and loss of sponsorship and endorsement deals, respectively.

20

The next section in the special verdict form was entitled "**TORT DAMAGES**."  It similarly noted that "[e]ach item of damages may be awarded only once as to this question, regardless of the number of legal theories, such as negligent misrepresentation or intentional misrepresentation, alleged."  Varga sought the same items of damages for his tort claims as he did for his contract claims.  The jury wrote in $0 for each item of damages listed.

The following section, entitled "**SUMMARY OF ALL DAMAGES**," asked the jury for the "total amount of damages, for all claims the jury awards to Varga."  The jury listed the same damages it identified for Varga's contract claims, awarding him a total of $20,720.34.

### d. Analysis

The trial court denied Varga's new trial motion based on the award of $0 in tort damages, concluding that the award was "consistent with the evidence that Varga suffered no more as a result of the tort than as a result of the contract breach, and the jury was instructed not to award duplicative damages."  Varga offers no reason why we should depart from this conclusion.

In general, a jury must avoid awarding duplicative damages for contract and tort claims.  "Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage supported by the evidence."  (*Tavaglione v. Billings* (1993) 4 Cal.4th 1150, 1158; see also *Pugh v. See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 761 & fn. 13 ["Ordinarily, a plaintiff asserting both a contract and tort theory arising from the same factual setting cannot recover damages under both theories"], disapproved on another ground in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351.)

21

The jury's verdicts must also be consistent. As previously discussed, "[a] special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh*, *supra*, 186 Cal.App.4th at p. 357.) If a verdict appears inconsistent or ambiguous, the court "will interpret the verdict if it is possible to give a correct interpretation." (*Woodcock v. Fontana Scaffolding & Equipment Co.*, *supra*, 69 Cal.2d at p. 457.) We look to the evidence and the jury instructions to try to resolve any inconsistency. (*Singh*, at pp. 357–358.)

In this case, the only evidence offered by the parties as to damages was the expert testimony described above in section II.A.2.a of this opinion regarding Varga's lost profits, sponsorships, and donations. As already noted, the jury, after considering the evidence, found that Varga was entitled to damages for the 30 days following his suspension, implicitly finding that Twitch had cause under section 5.2 of the Agreement to provide him a 30-day notice to terminate the Agreement and that Twitch would have terminated the Agreement after those 30 days had lapsed. The logical conclusion from these circumstances is that Varga would likewise not be entitled to tort damages beyond that 30-day period. (Civ. Code, § 3333 [measure of damages for tort claims "is the amount which will compensate for all the detriment proximately caused thereby"]; *Luttrell v. Island Pacific Supermarkets, Inc.* (2013) 215 Cal.App.4th 196, 205 ["As a general rule, a plaintiff in a tort action is not to be placed in a better position than he would have been in if the wrong had not been done."].)

Varga presents several arguments for why the award of tort damages is inconsistent with the special verdict and not duplicative of his contract

damages, all of which lack merit.[4]  First, he contends the award is inconsistent with the jury's special finding that Twitch's negligent representations were a "substantial factor in causing him harm."  He argues this finding is necessarily a finding that the negligent representations caused the suspension of his account, which is the only harm demonstrated by the evidence.  We understand his argument to be that because the jury found that Twitch's tortious conduct caused his suspension, he is entitled to damages beyond the 30-day notice period provided by section 5.2 of the Agreement, as Twitch had no cause to terminate the Agreement early.  In response, Twitch contends the evidence shows it would have suspended Varga's account for other, legitimate reasons.  We agree with Twitch.

The record established that Varga violated the Content Guidelines dozens of times in various ways.  Yet the evidence he cites shows, at most, a few representations of fact regarding specific instances or types of misconduct.  Thus, the jury could have believed that Varga's reliance on Twitch's negligent representations contributed to the decision to suspend his account but that it was not the only basis for his suspension, especially since Twitch cited Varga's entire history of violations as one reason for his suspension.[5]

---

[4] Twitch contends Varga waived any objection to the award of zero damages.  However, while defects in the form of a verdict may be waived, "inconsistent jury findings in a special verdict are not subject to waiver by a party."  (*Zagami*, *supra*, 160 Cal.App.4th at p. 1093, fn. 6.)

[5] Although he does not expressly argue this, Varga seems to suggest that a "substantial factor" encompasses a "but for" standard of causation.  However, "the adequacy of the evidence must be measured against *the instructions given the jury*."  (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535, italics added.)  Varga has not shown that the jury was instructed on the meaning of "substantial factor" such that we must conclude the jury found that Varga's suspension would not have occurred but

Further, any facial inconsistency or ambiguity in the special verdict is resolved by the jury instructions on damages, which specifically directed the jury to award each item of damages once for all claims asserted by Varga. (See *Singh, supra,* 186 Cal.App.4th at p. 358.) This is exactly what the jury did. It does not appear that the court ever instructed the jury to assess damages differently for each legal theory being asserted by Varga. We must review the verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed. (*Null v. City of Los Angeles, supra*, 206 Cal.App.3d at pp. 1534–1535; *Weisenburg v. Molina* (1976) 58 Cal.App.3d 478, 487, disagreed with on another ground by *Foggy v. Ralph F. Clark & Associates, Inc.* (1987) 192 Cal.App.3d 1204, 1210–1213.) Any assumption that the jury did not follow the instructions would be speculation. (See *Cassim v. Allstate Ins. Co.*, *supra*, 33 Cal.4th at pp. 803–804.)

The California authority cited by Varga is distinguishable because it does not involve duplicative damages. (See, e.g., *Smith v. Covell* (1980) 100 Cal.App.3d 947, 956 [award of zero damages to plaintiff was "a special category of inadequate damages resulting from the failure of the jury to follow the court's instructions" regarding damages]; *Campbell v. Zokelt* (1969) 272 Cal.App.2d 315, 319–320 [verdict in favor of defendant's passenger against codefendant for zero damages was inconsistent with verdict in favor of codefendant on his cross-complaint against defendant, and against defendant on his cross-complaint against codefendant]; *Bisnett v. Hollis* (1962) 207 Cal.App.2d 142, 148 [verdict finding in favor of plaintiffs was

---

for Twitch's tortious conduct. (*Defries v. Yamaha Motor Corp.* (2022) 84 Cal.App.5th 846, 865 [appellant has burden to show the jury was instructed on the issues being raised on appeal].)

inconsistent with award of no damages where evidence established that at least one plaintiff suffered property damage and personal injuries].)

Varga's reliance on federal authority is also misplaced. In *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.* (5th Cir. 1988) 858 F.2d 1075, the plaintiff asserted claims for antitrust and civil rights violations and tortious interference with a contract. (*Id.* at pp. 1077–1078.) The jury found liability on all three claims and awarded the plaintiff zero damages for its antitrust claim, $200,000 compensatory and $2.5 million punitive damages for its civil rights claim, and $1.245 million actual and $500,000 punitive damages for the tortious interference with contract claim. (*Id.* at p. 1078.) All three claims were based on the same set of facts and the same injury. (*Id.* at p. 1085.) The district court granted the defendants' motion for judgment notwithstanding the verdict as to the plaintiff's claim for tortious interference with contract. (*Id.* at p. 1078.) The Fifth Circuit affirmed the ruling on the motion but remanded for a new trial on damages because it was "unable to discern a reasonable explanation for the jury's wide-ranging verdicts under the three claims, especially after the major portion of damages under the tortious interference claim has been invalidated." (*Ibid.*) Thus, under the unique facts of *Video International*, the reason for the $0 award for the plaintiff's antitrust claim was unclear.

The court in *Rosario v. Livaditis* (7th Cir. 1992) 963 F.2d 1013 relied on *Video International* in reversing the district court's denial of a motion for a new trial on damages. (*Rosario*, at pp. 1021–1022.) There, a class of the defendants' former students brought claims against them under state consumer fraud law and the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.). (*Rosario*, at pp. 1015–1016.) The jury awarded $640,224 in actual damages for the class's consumer fraud claim

and zero damages for the RICO claims. (*Rosario*, at pp. 1016, 1021.) The Seventh Circuit concluded that because the claims were based on identical facts, "the facts must support some actual damages award for the RICO claims." (*Id.* at p. 1021.) It noted that the "jury in this case clearly did not consider as damages the students' undisputed loan obligations to the government" of over $3 million, even though a finding of liability on the RICO claims was "predicated on determining that the class was injured in business or property, defined as obligations to pay student loans." (*Rosario*, at p. 1021.) It therefore reversed the trial court's order denying a new trial because the "jury verdict [was] in contravention of the court's instructions." (*Ibid.*)

In contrast, the award for tort damages in this case is consistent with the evidence and the jury's instructions on damages. (See *Little v. Amber Hotel Co.*, *supra*, 202 Cal.App.4th at pp. 300–301 [interpreting jury's failure to state amount of damages as an attempt to prevent a double recovery based on the evidence and instructions].) Further, it appears that the RICO claims and the consumer fraud claim in *Rosario* involved different injuries (*Rosario v. Livaditis*, *supra*, 963 F.2d at p. 1021), while Varga sought the same items of damages for his contract and tort claims.[6]

_____

[6] The third case cited by Varga—*AIG Aviation, Inc. v. Boorom Aircraft, Inc.* (6th Cir. 1998, Nos. 96-1503, 96-1563, 96-1582) 1998 U.S.App. Lexis 2143—similarly concerned an award of damages for the plaintiff's state claim but zero damages for its RICO claim, even though the jury found the defendants liable on both claims. (*AIG Aviation*, at p. 1.) In remanding for a new trial on the RICO damages, the Sixth Circuit noted that the claims—and thus the damages—were alternative claims, and that the damages for the RICO claim was likely to be larger than the damages for the state law claim. (*AIG Aviation*, at p. 5–6.)

26

Varga next contends that based on the structure of the verdict form, the jury was required to separately identify damages for the contract and tort claims and account for any duplication in the section regarding "total" damages.  In particular, he argues that question 20 in the "**TORT DAMAGES**" section "plainly instructed the jury only to calculate Varga's tort damages" because it stated that " '[e]ach item of damages may be awarded only once *as to this question . . . .*' "  Although the special verdict form is not a model of clarity, we agree with the trial court that in light of the jury instructions, the jury clearly determined that Varga was not entitled to tort damages above and beyond what it had already awarded him for his contract claims in the previous section of the verdict form, a finding that is consistent with the language of the verdict form.

We are aware of authority suggesting that special verdict forms should not, as they did here, ask the jury to identify damages for each of several causes of action and simply direct the jury to avoid duplicative damages without explanation.  (See *Singh, supra,* 186 Cal.App.4th at pp. 360–361 [concluding that the "better practice" when a special verdict form is used for multiple claims is to instruct jury to consider each question separately and let the trial court eliminate any duplicative awards after verdicts are rendered]; *Plotnik v. Meihaus* (2012) 208 Cal.App.4th 1590, 1612 [holding it improper to award damages on different counts for the same wrong, even where parties took steps to avoid award of duplicative damages].)  But we need not resolve here whether the instructions and the verdict form were improper for these reasons because it does not appear that Varga made this argument in the trial court at the time the forms and instructions were given to the jury.  (*Zagami, supra*, 160 Cal.App.4th at p. 1093, fn. 6 [party must object to form of verdict or risk waiver on appeal of defect].)

Third, Varga contends that because tort claims "permit awards of far broader damages than contract claims," he was entitled to tort damages beyond the 30-day notice period.  The authority he relies on is inapposite, however.  *Nuvasive, Inc. v. Madsen Med., Inc.* (S.D.Cal. July 20, 2015, No. 13cv2077 BTM(RBB)) 2015 U.S.Dist. Lexis 178452, concerned, in part, the cross-defendant's request in its summary judgment motion to limit the cross-plaintiff's damages to the term of the parties' contract.  (*Id.* at pp. 1, 39-40.)  The district court declined to limit damages at that stage of the litigation because the cross-plaintiff was claiming that the cross-defendant had tortiously interfered with its ability to perform under the contract, and there was a genuine issue of material fact regarding whether the contract would have been renewed absent the tortious conduct.  (*Ibid.*)  In contrast, here, the jury implicitly determined that Twitch would have terminated the Agreement even absent its tortious conduct.

In *Erlich v. Menezes* (1999) 21 Cal.4th 543, our high court acknowledged that the measure of both contract and tort damages is the amount which will compensate for the detriment proximately caused by the wrongdoing.  (*Id.* at p. 550.)  It noted, however, that contract damages are limited to "the financial risks of [the parties'] enterprise," while tort damages are intended to compensate the victim for all injuries suffered, including emotional injuries.  (*Ibid.*)  But here, the only damages Varga sought for his contract and tort claims were his lost profits.

Lastly, Varga contends he suffered damages beyond the 30-day notice period because "[e]ven if Twitch could have terminated [his] . . . Agreement 30 days after it suspended him, that would not have precluded Varga from earning donations or sponsorships by streaming as a normal streamer."  This does not appear to be an issue Varga raised in the trial court, and it lacks

merit anyway considering he continuously violated not only the Agreement but also the terms of service applicable to all Twitch users despite repeated warnings. Thus, the jury could reasonably conclude that Twitch would have terminated its relationship with Varga after the 30-day notice period required by section 5.2 of the Agreement.

In sum, Varga has not shown that the award of tort damages is inconsistent with the jury's special findings. And because the jury implicitly determined that Twitch would have terminated the Agreement after the 30-day notice period under section 5.2 of the Agreement, a finding we do not disturb on appeal, we also conclude that the award of tort damages is not inadequate as a matter of law. We therefore affirm the trial court's denial of Varga's new trial motion.[7]

**B. Motion to Tax Costs**

Varga contends the trial court erred in awarding Twitch its electronic discovery costs. After the jury returned its verdict, Twitch sought, among other things, $169,406.31 in electronic discovery costs pursuant to section 998. Counsel's supporting declaration stated that Twitch incurred those costs by using a vendor to convert electronic files into usable form, process the files for production, and Bates-number them. The vendor also hosted the data and charged hosting fees. Varga moved to strike the request for electronic discovery costs, arguing that those costs were not reasonably necessary or recoverable under section 1033.5. The trial court ultimately

---

[7] In light of this affirmance, we need not and do not reach Varga's arguments regarding additur and the scope of a new trial.

29

awarded Twitch the full amount of its request for electronic discovery costs. We agree with Varga that the court erred in doing so.

In general, a prevailing party in civil litigation is entitled to recover their costs. (§ 1032.) Section 998 " 'establishes a procedure to shift costs if a party fails to accept a reasonable settlement offer before trial.' " (*Oakes v. Progressive Transportation Services, Inc.* (2021) 71 Cal.App.5th 486, 497.) We presume Twitch's settlement offer was sufficient to shift costs under section 998 because Varga does not contend otherwise.

Section 1033.5 lists cost items that are allowable under section 1032, including filing fees and attorney fees when authorized by contract or law. (§ 1033.5, subd. (a)(1)–(10).) Subdivision (b) of section 1033.5 identifies costs that are not allowable. These include investigation expenses in preparing for trial and photocopying expenses other than for exhibits. (*Id.*, subd. (b)(2)–(3).)

"Expenses which do not fit into either of these two categories . . . may be recovered but only at the discretion of the court." (*Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095, 1103 (*Science Applications*); § 1033.5, subd. (c)(4).) "Allowable costs must be 'reasonably necessary to the conduct of the litigation' and 'reasonable in amount.' " (*Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 693; § 1033.5, subd. (c)(2)–(3).) Costs that are "merely convenient or beneficial to [the] preparation" of the conduct of the litigation are not recoverable. (§ 1033.5, subd. (c)(2).)

"The standard of review applicable to a cost order depends on the issue raised on appeal. When the question is whether a claimed cost comes within the general cost statutes and is recoverable at all, the question is one of statutory interpretation, subject to de novo review. . . . Whether a cost item

30

was reasonably necessary to the litigation, however, ' " 'presents a question of fact for the trial court and its decision is reviewed for abuse of discretion.' " ' " (*Coalition for Adequate Review v. City and County of San Francisco* (2014) 229 Cal.App.4th 1043, 1050–1051.)

Electronic discovery costs are neither specifically allowed nor prohibited under section 1033.5. Thus, these costs are generally recoverable at the trial court's discretion. (*Science Applications*, *supra*, 39 Cal.App.4th at p. 1103.) Because Varga properly objected to the electronic discovery costs requested by Twitch, Twitch had the burden of proving the costs were recoverable, reasonable, and necessary. (*Lowry v. Port San Luis Harbor Dist.* (2020) 56 Cal.App.5th 211, 222.)

As he did in the trial court, Varga contends Twitch failed to meet its burden to prove that its electronic discovery costs were reasonably necessary, " 'rather than merely convenient or beneficial to its preparation.' " (§ 1033.5, subd. (c)(2)–(3).) Citing *Science Applications*, *supra*, 39 Cal.App.4th 1095, he also argues that the costs were not recoverable as a matter of law. We agree with the latter contention as to a portion of the costs claimed by Twitch.

In *Science Applications*, the prevailing party paid a vendor $200,000 "to keep track of the voluminous records in the case—that is, to 'Bates-stamp' the documents, input them for retrieval, maintain a document library," and create a searchable database for use during discovery and trial. (*Science Applications*, *supra*, 39 Cal.App.4th at p. 1104.) The appellate court held these expenses were akin to hiring "a 'high tech' paralegal" to compile documents and create a searchable database, and that such labor costs were "not recoverable" because attorney fees were not recoverable. (*Ibid.*)

In comparison, in *Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323 (*Hooked Media*), the trial court awarded $92,000 for

electronic discovery costs to convert "native electronic files into usable form." (*Id.* at p. 338.) The appellate court affirmed the cost award, finding that "Hooked makes valid arguments that the e-discovery costs may have been incurred more out of convenience than necessity. But given our deferential standard of review, reversal is not warranted. The trial court, having closely observed the litigation as it progressed over several years, was in a much better position than we are to decide whether expenses associated with managing electronic data were necessarily incurred." (*Id.* at pp. 338–339.)

The concurrence in *Hooked Media* distinguished *Science Applications* from the facts before it: "Here, unlike in *Science Applications*, the third party vendor expenses incurred by Apple for data conversion of files into a 'usable form' so that those files could be produced to Hooked were not akin to paralegal or attorney expenses. The costs incurred for the technical process of converting data files into a usable form so that those files can be produced in response to document production requests was not addressed in *Science Applications*, and such costs are not addressed in . . . section 1033.5. It follows that the superior court had discretion to allow or disallow these costs. Hooked makes no argument that the court abused its discretion." (*Hooked Media, supra,* 55 Cal.App.5th at p. 354 (conc. opn. of Mihara, J).)

The distinction drawn by *Science Applications* and *Hooked Media* between recoverable electronic discovery costs and nonrecoverable costs appears based on the commonsense notion that a prevailing party who may not recover attorney fees and costs related to storing, organizing, and managing documents, cannot recover equivalent discovery costs merely because the documents are in electronic form. (See *City of Oakland v. McCullough* (1996) 46 Cal.App.4th 1, 7 [paralegal services are includable in an award of attorney fees].) But costs unique to the electronic form of the

32

documents—such as the costs required to convert files into a usable form— are "not akin to paralegal or attorney expenses" and may be reasonably necessary to respond to a discovery request. (*Hooked Media*, *supra*, 55 Cal.App.5th at p. 354 (conc. opn. of Mihara, J).)

The record in this case indicates that at least some of Twitch's electronic discovery costs were associated with the technical processes of converting files into usable forms, creating "tiff image[s]," and producing metadata, and thus those costs were similar to the costs found recoverable in *Hooked Media*. (*Hooked Media*, *supra*, 55 Cal.App.5th at pp. 338–339.) The trial court did not abuse its discretion in concluding these costs were reasonably necessary to the litigation, considering that Varga served "at least" six sets of requests for production on Twitch, and Twitch collected "thousands of pages of documents." Under the circumstances, using an electronic document platform to manage discovery was more "efficient than any low-tech method of doing the same thing." (*El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150 Cal.App.4th 612, 620.) And, as in *Hooked Media*, the court, having observed the litigation for years, was in a better position to determine whether the electronic discovery expenses requested by Twitch were reasonable and necessary. (*Hooked Media*, at pp. 338–339.)

However, we cannot determine from the record whether the fees associated with "hosting" and Bates-numbering the documents were "akin" to paralegal expenses. (*Science Applications*, *supra*, 39 Cal.App.4th at p. 1098.) Twitch did not seek attorney fees and costs, which suggests it was not entitled to such expenses. Accordingly, we remand for a redetermination by the trial court consistent with *Science Applications* of the proper amount of recoverable costs pertaining to electronic discovery. (See *Coalition for*

33

*Adequate Review v. City and County of San Francisco*, *supra*, 229 Cal.App.4th at p. 1060 [remanding for trial court to determine which of the costs claimed by the prevailing party were recoverable].)

### III.   DISPOSITION

The order denying Varga's motion to tax or strike Twitch's electronic discovery costs and the portion of the judgment awarding Twitch its electronic discovery costs are reversed.  The matter is remanded to the trial court to recalculate in accordance with this opinion the amount of Twitch's electronic discovery costs that are recoverable under section 1033.5.  The judgment is otherwise affirmed.  The parties shall bear their own costs in this appeal.

LANGHORNE WILSON, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A166747
*Varga v. Twitch Interactive Inc.*